**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| **RARIDON & ASSOCIATES ORTHOPEDICS, INC.,**<br><br>   **Plaintiff,**<br><br>v.<br><br>**ROBERT SCHMIDT, MIDWEST MEDICAL RESOURCES, INC.**<br><br>   **Defendants,** | **CASE NO.** 4:-21-cv-280<br><br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>**AND JURY DEMAND FOR COUNTS II-IV** |

Plaintiff Raridon & Associates Orthopedics, Inc. ("Raridon") states the following for its Second Amended Complaint against Defendant, Robert Schmidt ("Schmidt") and Midwest Medical Resources, Inc. ("MMR"):

## PARTIES, JURISDICTION, AND VENUE

1.     Raridon is an Iowa corporation doing business in Iowa with its principal place of business in Clive, Iowa.

2.     Schmidt is a resident of Kansas.

3.     MMR is a Kansas corporation with its principal place of business in Overland Park, Kansas.

4.     Raridon and Schmidt entered into an Independent Contractor Agreement ("Agreement") on January 1, 2016. The Agreement is attached hereto as Exhibit 1.

5.     Schmidt and MMR entered into an Independent Contractor Agreement ("MMR Agreement") on or about July 1, 2021. The MMR Agreement is attached hereto as Exhibit 2.

#3376525

**EXHIBIT**

**A**

exhibitsticker.com

6.     The subjects of this lawsuit are: (1) Schmidt's breach of the Agreement and (2) Schmidt and MMR's conspiratorial and tortious actions interfering with Schmidt's contract with Raridon and the resulting unjust enrichment therefrom.

7.     The Agreement's choice-of-law provision requires litigation be conducted in the Southern District of Iowa relating to Schmidt.

8.     MMR serves the entire Midwest through a network of sales representatives and other employees in Missouri, Kansas, Oklahoma, Iowa, and Nebraska. *See* https://mwmedical.net/find-a-rep (last accessed 07/20/2021).

9.     The MMR Agreement describes the company as, "a distributor of sports medicine and rehabilitation orthopedic and other medical Products . . . in the States of Missouri, Kansas, Oklahoma, Iowa and Nebraska and other areas of the country." Ex. 2.

10.     The MMR Agreement describes Schmidt's "Non-Compete Territory," in part, as "the States of Missouri, Kansas, Oklahoma, Nebraska, Iowa and southern Illinois south of Interstate 80." Ex. 2, Section 10.1(g).

11.     The MMR Agreement includes a non-complete clause acknowledging that it is "necessary, reasonable, and properly required" for MMR to protect its "investment in its business, in the sale and solicitation for sales of the products and services by MMR within the Non-Compete Territory." Ex. 2, Section 10.2.

12.     The MMR Agreement defines "MMR Products" as "medical and surgical instruments and devices in the field of arthroscopy, powered surgical instruments and sports tissue and biologics distributed and sold by MMR . . . in the States of Missouri, Kansas, Oklahoma, Nebraska, Iowa and Illinois[.]" Ex. 2.

2

13.     The MMR Agreement's choice-of-law provision does not contain a specific venue or jurisdiction for the resolution of disputes but does state that the MMR Agreement should be construed using the laws of Missouri. Ex. 2, Section 13.4.

14.     MMR either knew or should have known that Schmidt had a contract with Raridon and that Raridon is an Iowa entity.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

16.     Complete diversity between Raridon and Schmidt/MMR exists pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000. Both Defendants are subject to the jurisdiction of this court.

## FACTUAL ALLEGATIONS

17.     On January 1, 2016, Raridon and Schmidt entered into the Agreement.

18.     The Agreement contains terms governing the business relationship between the parties wherein, generally, Schmidt agreed to act as an independent contractor marketing and selling Raridon's orthopedic products while Raridon agreed to compensate Schmidt as described in the Agreement.

19.     The Agreement required Schmidt not to sell competing products.

20.     The Agreement required Schmidt not to solicit or interfere with Raridon's other independent contractors, employees, or business.

21.     Schmidt sold Raridon products to Dr. Joe Mumford at Stormont Vail Hospital in Topeka, Kansas.

22.     Elijah Jimerson ("Jimerson") worked as an independent contractor for Raridon and a sub-contractor under Schmidt at Stormont Vail Hospital in Topeka, Kansas.

23.     Among other things, Raridon sold DePuy Synthes knee and hip joints.

24.    On June 23, 2021, Schmidt asked Jimerson to send him photographs of the screens showing each stage of the intra-operative computer-guided navigation for implantation of Raridon/DePuy Synthes knee and hip joints.

25.    Jimerson sent Schmidt the photographs by text message.

26.    On June 23, 2021, MMR, a regional distributor of Don Joy Orthopedic ("DJO") implants, held a cadaver lab to give Dr. Mumford a hands-on opportunity to use their products.

27.    The cadaver lab was made arranged through the joint efforts of MMR personnel and Schmidt.

28.    During the months leading up to the cadaver lab, Schmidt worked together with MMR personnel to persuade Dr. Mumford to switch to MMR's products.

29.    Prior to the lab, on June 11, 2022, MMR offered Schmidt a sales position.

30.    After the lab, Dr. Mumford agreed to trial DJO products.

31.    Schmidt worked with Dr. Mumford and his surgical staff to select the surgeries wherein Dr. Mumford would trial DJO products.

32.    On June 25, 2021, Schmidt told Jimerson that Dr. Mumford was going to try using a competing manufacturer's hip and knee joints, those of "DJO, LLC." Schmidt asked Jimerson to cover the Brainlab navigation portion of those procedures.

33.    Schmidt also asked Jimerson not to talk to the person he reported to at Raridon, David Jandric, about Dr. Mumford's use of DJO products.

34.    On June 29, 2021, Jimerson assisted Dr. Mumford with implantation of three DJO products instead of the previously scheduled Raridon/De Puy Synthes products.

35.    That same day, Jimerson confirmed to Schmidt that the first DJO surgery had been completed, and Schmidt asked Jimerson to call him.

4

36.     On June 30, 2021, Jimerson assisted Dr. Mumford with another three procedures using DJO products instead of Raridon's De Puy Synthes products.

37.     Dr. Mumford continued using the competing products to-date.

38.     That same day, Jandric texted Jimerson. Instead of responding, Jimerson contacted Schmidt according to Schmidt's instructions. Schmidt told Jimerson that Jandric was likely calling to discuss an exit interview.

39.     Raridon attempted to contact Schmidt multiple times over the next three days and Schmidt failed to respond.

40.     Jimerson then contacted Jandric. Despite Schmidt's request that he not talk to Jandric, Jimerson told Jandric about Dr. Mumford's use of the DJO products.

41.     On July 1, 2021, Jimerson told Schmidt that he had told Jandric about Dr. Mumford trialing the DJO products.

42.     On July 2, 2021, Schmidt attempted to call Jimerson. Jimerson did not answer because he realized that Schmidt had been working against Raridon and De Puy Synthes.

43.     Raridon terminated Schmidt's Agreement on July 2, 2021.

44.     Schmidt is under contract with MMR, *see* Exhibit 2

### COUNT I - BREACH OF CONTRACT
**Against Defendant Schmidt**

45.     Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 44.

46.     The parties entered into the Agreement on January 1, 2016.

47.     Schmidt agreed not to sell competing products or solicit or interfere with Raridon's other independent contractors or employees.

48.     Raridon agreed to compensate Schmidt as described in the Agreement.

49.     Raridon fulfilled its contractual obligations.

50.     Schmidt breached the Agreement by substituting competing DJO products during surgeries performed by a Raridon customer, Dr. Joe Mumford, and by using a Raridon independent contractor, Elijah Jimerson, to facilitate the substitution.

51.     Schmidt also breached the Agreement by inducing Jimerson to photograph Raridon's intellectual property and send the photographs to him by text message.

52.     Schmidt's breaches caused damage to Raridon.

53.     Raridon requests damages in the amount owing and due under the Agreement.

54.     Raridon requests recovery of attorney's fees as provided for under Paragraph 11 of the Agreement following a successful prosecution of this claim.

## COUNT II - TORTIOUS INTERFERENCE WITH CONTRACT
### Against MMR

55.     Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 44.

56.     Raridon had a written contract with Schmidt.

57.     MMR was aware of that contract.

58.     MMR intentionally and improperly interfered with that contract on multiple occasions, including but not limited to when CEO John Tarantino aided Schmidt in facilitating a DJO cadaver lab for Dr. Mumford with the assistance and involvement of Schmidt.

59.     MMR's intentional interference caused Schmidt to breach his contract with Raridon.

60.     Raridon requests compensatory and punitive damages caused by MMR and Schmidt's actions in an amount to be proven at trial.

61.     Raridon requests a jury for this Count.

## COUNT III - UNJUST ENRICHMENT
### Against MMR

62.     Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 44.

63.     MMR was unjustly enriched by receiving the benefit of Dr. Mumford's use of DJO implants provided by MMR created by the unlawful competition and activities of MMR and Schmidt.

64.     MMR enrichment was at the expense of Raridon.

65.     It is unjust to allow MMR the benefit of the sales gleaned through conspiratorial and tortious actions.

66.     Raridon requests the Court impose a constructive trust and/or disgorgement of the damages caused by MMRs action in an amount to be proven at trial.

67.     Raridon requests a jury for this Count.

## COUNT IV - CIVIL CONSPIRACY
### Against Defendants Schmidt and MMR

68.     Plaintiff incorporates by reference the allegations set out in paragraphs 1 through 44.

69.     Defendants MMR and Schmidt committed tortious interference with contract and were unjustly enriched and caused damages through their wrongful actions.

70.     Defendants MMR and Schmidt participated in a conspiracy with each other to tortiously interfere with Raridon's contract with Schmidt, causing a breach thereof, and were unjustly enriched because of their wrongful actions.

71.     Raridon requests compensatory and punitive damages caused by MMR and Schmidt's actions in an amount to be proven at trial.

72.    MMR and Schmidt are jointly and severally liable for the damages caused by their conspiracy.

73.    Raridon requests a jury for this Count.

WHEREFORE, Plaintiff Raridon requests judgment against Defendants, jointly and severally, in its favor in an amount which will fully and fairly compensate it for its damages and for the maximum interest allowed by law; and for such other and further relief as the Court deems just and equitable under the circumstances.

## JURY DEMAND

74.    Raridon hereby demands a Jury on Counts II through IV.

/s/ Michele Brott
Michele L. Brott AT0010068
Elizabeth A. Etchells AT0012670
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Email: michele.brott@dentons.com
Email: elizabeth.etchells@dentons.com
ATTORNEYS FOR PLAINTIFF

Copies to:

Douglas A. Fulton AT0002672
Allison M. Steuterman
BRICK GENTRY PC
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Email: douglas.fulton@brickgentrylaw.com
Email: allison.steuterman@brickgentrylaw.com

ATTORNEYS FOR DEFENDANT

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the attorneys of record of all parties to the above-entitled cause herein at their respective addresses disclosed on the pleadings on **July 20, 2022,** by:

__ U.S. Mail                        __ FAX
__ Hand Delivered            __ Overnight Courier
__ Federal Express            X Other: CM-ECF/EDMS

Signature:___/s/ Michele L. Brott_____

# INDEPENDENT CONTRACTOR AGREEMENT

**THIS INDEPENDENT CONTRACTOR AGREEMENT** is entered into on January 1, 2016 ("Effective Date") by and between Raridon & Associates Orthopedics, Inc., an Iowa corporation having its principal offices at 10170 Hickman Court, Clive, Iowa 50325 (the "**Company**"), and Robert Schmidt, a resident of the State of Kansas, (the "**Contractor**") (individually, "Party" and collectively "Parties").

**WHEREAS,** Contractor shall serve or continue serving as an independent sales contractor for Company in connection with the sale of certain orthopedic products as described herein; and

**WHEREAS,** Contractor has had and/or will have access to Company's customers, training, confidential and trade secret information which require protection for the benefit of the Company, its vendors and affiliates; and

**WHEREAS,** Company is contractually obligated to obtain certain restrictive covenant agreements from its contractors pursuant to an agreement with DePuy Synthes Sales, Inc. and Johnson & Johnson; and

**WHEREAS,** Contractor has agreed to abide by the terms of such restrictive covenant agreements in order to establish and/or maintain his/her status as an independent sales contractor for the Company and otherwise perform services in accordance with the following terms.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      **Services**.  Company hereby appoints Contractor to sell the products listed on Exhibit 1 (the "Products") to certain accounts and within the Territories listed on Exhibit 1, attached hereto and incorporated by this reference, during the term of this Agreement. While this Agreement is in effect and Contractor is not in default hereof, Contractor shall be permitted to sell Products to the assigned accounts and within the assigned territories. Contractor agrees to use Contractor's best efforts to sell the Products to develop the assigned territories and accounts to their fullest potential, agrees to keep Company informed of Contractor's activities and sales on behalf of Company, agrees to attend all training and educational programs required by the Company and its Vendors and Affiliates and agrees to attend all meetings as requested by the Company.

2.      **Term and Termination.**  This Agreement shall remain in effect from the Effective Date until this Agreement is terminated as provided for herein (the "Term"). Either party can terminate this Agreement without cause by giving the other thirty (30) days' prior written notice of termination. However, if either party breaches any term of this Agreement, the Agreement may be terminated immediately without the necessity of giving notice. Contractor will be paid for all services rendered as of the date this Agreement is terminated.

**EXHIBIT**

1

**Exhibit 1, Page 1 of 12**

3.    **Payment.** In consideration of Contractor's satisfactory performance of the duties and obligations under this Agreement, Contractor shall be paid as outlined in Exhibit 2 attached hereto and incorporated herein by this reference. Payment shall be made to Contractor on or before the 20th day of each month. Company shall have the right to prospectively change compensation terms from time to time.

4.    **Products, Accounts and Territories.** The Products, Accounts and Territories assigned to Contractor are listed on Exhibit 1, attached hereto and incorporated herein by reference. The Company reserves the right to add, delete, change or reassign Products, Accounts, Territories and commission rates from time to time and will advise Contractor of the same. The Company shall establish goals and objectives for the level of business activity and sales for each assigned Product, Account and Territory and will communicate the same to Contractor on an annual basis.

5.    **Orders, Sales Prices and Payments.** All orders submitted by Contractor are subject to acceptance by Company. Contractor agrees to represent and sell Company's Products at the prevailing prices and payment terms established by Company, as of the time of the sale. Contractor agrees to instruct customers to make payments for merchandise payable directly and solely to Company and to remit such payments directly to Company. Contractor is prohibited from endorsing any check drawn to the order of Company. If for any reason payments are received by Contractor, Contractor will hold the entire amount of such payments as a fiduciary in trust for Company and remit such payments to Company immediately upon receipt, together with the information showing the identity of the customer and of the products purchased.

6.    **Scope of Activity.** The Parties acknowledge and agree that Contractor is engaged in an independent business and that this Agreement does not contemplate that the Company will have exclusive use of Contractor's services. Nothing in this Agreement shall preclude Contractor from being engaged to represent or sell for other entities or principals during the Term, provided that during the term of this Agreement, Contractor and Contractor's employees and subcontractors shall not represent or sell Competitive Products (as defined herein) or engage in Competitive Activities (as defined herein) without prior written approval of Company, which may be granted or withheld in Company's sole discretion.

7.    **No Employment Relationship.** The Parties' relationship hereunder shall be that of independent contracting parties and this Agreement shall not be interpreted or construed as creating any other relationship, including but not limited to that of employer-employee, principal-agent, partnership or joint venture. Contractor acknowledges and understands that, as in independent contractor, Contractor is not entitled to participate in any compensation plans, health, life or disability insurance programs or other fringe benefits which the Company from time to time provides for its employees. Contractor shall be solely responsible for procuring all insurance for himself or herself, including but not limited to medical, disability, workers' compensation, and unemployment insurance. To the extent

2

that Contractor hires employees, Contractor shall be solely responsible for the employees' wages, income tax withholdings, Social Security, unemployment taxes and workers' compensation insurance covering work performed by the Contractor's employees. Contractor shall be liable for and shall hold the Company harmless from and against all claims arising due to negligence, intentional acts and errors or omissions by Contractor in providing services under this Agreement, as well as all taxes, penalties or assessments on any compensation earned as an independent contractor hereunder, including federal and state income taxes, self-employment taxes, FICA and FUTA taxes and those taxes related to payments made by Contractor to its employees or assistants. Contractor is responsible for completing the appropriate IRS forms, and shall receive an IRS Form 1099 annually from the Company.  Contractor is responsible for the payment of all costs of business equipment such as cell phones, computers, motor vehicles and/or other items incidental to the business of Independent Contractor.  All personal expenses while traveling are the responsibility of Contractor. Contractor is not entitled to expense reimbursement or reimbursement for other costs. Company shall not have the right to require Contractor to conform to any fixed schedule or minimum hours of work devoted to Company's accounts, and shall not control the time, place, manner or means by which Contractor performs this Agreement. All services performed by Contractor and Contractor's employees shall conform to the highest standards and customs of professional sales contractors in the industry, this Agreement and in accordance with all applicable laws and regulations.

8.    **Limitation on Authority**.  Contractor is not authorized to enter into any contract or agreement on behalf of Company, or to otherwise bind Company without Company's prior written approval.  Contractor shall use Company's name and trademarks only in connection with the representation and sale of the Products.

9.    **Product Representations**.  Contractor shall sell only Products which continue to conform to the specifications and quality control procedures of the Vendor(s) (as defined herein).  Contractor shall make no false or misleading representations with respect to the Products.  Contractor shall make no express or implied warranties of any kind regarding the Products.  Contractor shall not knowingly submit to Company false information, or information known by Contractor to be inaccurate or misleading regarding (a) sales of Products; (b) customers to whom Products were sold; (c) expenses which were or are to be paid or reimbursed in whole or in part by Company; or (d) the inventory of Products in the State(s) of Illinois, Iowa, Nebraska, Kansas and Missouri.

10.    **Covenants**.  The Parties acknowledge and agree that the Company has made a considerable investment in developing its trade secrets and proprietary business methods and information, acquiring and retaining its customers and that Contractor will have substantial contact with customers and is and will be uniquely positioned to acquire commercially valuable information about Company customers.  The Parties therefore acknowledge and agree that it is vital that the confidentiality of the Company's business methods, proprietary Products information, services, records and information be protected, and that the Company is protected from solicitation and competition by Contractor during the term of this Agreement and for a reasonable time following the

3

termination or expiration of the Agreement. Contractor also agrees that these provisions shall run to the benefit of the Vendors and their Affiliates who shall have the same right to enforce these provisions as the Company. Therefore, the Parties agree to the covenants set forth below:

(a)    **Definitions:**

"**Affiliate**" shall mean any other entity controlling, controlled by or under common control with Vendor.

"**Competitive Activities**" shall mean selling, offering for sale, promoting, receiving or soliciting orders for Competitive Products or accepting remuneration of any kind from any person providing such goods or services.

"**Competitive Products**" shall mean any Product or service that competes with a Product set forth in Exhibit 1 or any modification or amendment to Exhibit 1 and any orthopedic, spinal, sports medicine, bracing, biocomposites neurosurgical or trauma product or service or any other product or service similar to or intended for a similar use as those offered or provided by the Company or its Vendors or Affiliates.

"**Solicitation Activities**" shall mean to solicit, employ, retain or offer to retain (whether as an independent contractor or otherwise), any (i) employee, contractor or agent of Company or Vendor(s), or (ii) any person or entity which is engaged, whether full-time or part-time as an employee, contractor or agent of any third party in the marketing, sale or distribution of any Competitive Product or any other products or services of Company or Vendor(s).

"**Territory**" shall mean those territories listed on Exhibit 1, as amended from time to time.

"**Vendor**" shall mean Johnson & Johnson and DePuy Synthes Sales, Inc.

(b)    **Confidentiality and Trade Secrets**.    As used in this Agreement, "Confidential Information" shall mean any and all information and compilations of information relating to Company's or Vendor'(s) business which Company or Vendor(s) provided to Contractor, or to which Contractor had or has access while affiliated with Company, Vendor(s) or Affiliates, and which information or compilations of information are not generally known to the public, including without limitation, customer lists, customer preferences, account history information, business and operations strategies, sales and marketing strategies, products in development, financial information, pricing strategies, commission structure, Identified Prospective Customers, and trade secrets. Contractor shall hold in confidence and agree not to use or disclose to others any trade secret or Confidential Information possessed from time to time by Contractor that relates to Company or Vendor(s) or Affiliate(s), other than as required in the course of performing Contractor's obligations under this Agreement. Upon termination of this Agreement for any reason, Contractor agrees to return to Company Confidential Information and all other

4

**Exhibit 1, Page 4 of 12**

property or documents belonging to Company or that relate to Company's, Vendor(s)' or Affiliate(s)' business or that contain trade secrets or Confidential Information of the Company, Vendor(s) or Affiliate(s) and are in Contractor's possession, custody or control (including electronic copies). Contractor's obligation of confidentiality shall survive such termination and shall remain in effect until and unless such trade secrets or Confidential Information have become, through no fault of Contractor, generally known in the public domain or have reached the end of their useful life, whichever occurs first. All Confidential Information is and shall remain the sole and exclusive property of the Company. "Identified Prospective Customers" includes organizations, businesses or individuals that have been identified by the Company as an opportunity for obtaining future business (whether directly or through referral of other business).

(c). **Protection of Company's Goodwill**. Contractor agrees that for a period of one (1) year after the termination of this Agreement, Contractor will not, directly or indirectly, on Contractor's own behalf or in association with or through any other individual or entity, engage in Competitive Activities in the Territory or the solicitation of Company customers or accounts with whom Contractor had personal contact during the term of this Agreement. For purposes of this Section 10(c) only, Competitive Products and/or Competitive Activities shall include only products and/or services which were sold or provided by the Company at the time of such termination and shall not include any other products or services sold or provided by any other J&J company. For purposes of this Section (c) only, Company customers include customers having done business with the Company during the one (1) year prior to termination of Contractor's relationship.

(d). **Non-Solicitation of Other Independent Sales Contractors or Employees**. Contractor agrees that for a period of one (1) year after the termination or expiration of this Agreement, Contractor will not directly or indirectly engage in Solicitation Activities.

(e). **Non- Interference**.  Contractor agrees that for a period of one year following the termination of this Agreement, Contractor shall not directly or indirectly interfere with the Company's or Vendor's business.

(f) **No Sales of Competitive Products**. Contractor agrees that commencing on the Effective Date of this Agreement and continuing until its termination, Contractor will devote Contractor's best efforts and sufficient working time to selling the Products identified on Exhibit 1 attached hereto, and shall not engage in the sale of Competitive Products (as defined herein) or in Competitive Activities (as defined herein) without obtaining prior written consent from the Company. If Contractor is involved in the sale of Competitive Products or in Competitive Activities on the Effective Date of this Agreement, then Contractor agrees to cease such sales and activities immediately or as soon as contractually permissible and shall advise the Company President accordingly. Neither Contractor nor any member of Contractor's immediate household will receive compensation for the sale of Competitive Products or Competitive Activities

Contractor agrees that no claim that Contractor has against the Company shall constitute a defense to enforcement of this Section.

5

11.     **Reasonableness and Enforcement of Covenants**.  It is understood and agreed that the restrictions in paragraph 10 do not prevent Contractor from earning a living. It is further agreed that Contractor is not restricted from engaging in other lines of work, or from pursuing a profession as a sales representative in the sale of other products or for other companies, subject only to the foregoing limited restrictions.  Contractor agrees that the restrictions in paragraph 10 are necessary, reasonable and fair measures to protect Company's secrets and goodwill which are entrusted to Contractor under this Agreement; that a violation thereof will cause Company irreparable harm which cannot be fully remedied by monetary damages; and that in the event of a violation, Company shall be entitled to, without the necessity of posting a bond, injunctive relief and all damages and other relief which any court or jury may award at law or in equity including reasonable attorney's fees to the Company should it maintain a successful action to enforce the covenants in Paragraph 10.  Contractor further agrees that in the event of a violation of paragraph 10(c) (Protection of Company's Goodwill), the one-year restriction shall be extended during the period of violation so that Company is afforded the protection of the full one year.  Contractor acknowledges that Contractor will not be unduly burdened by the enforcement of paragraph 10.

12.     **Compliance**.  Contractor will not alter or modify the Products or the original packages or repackage the Products in any way prior to delivery.  Contractor shall at all times conduct his/her activities in accordance with the labeling limitation on the Products, the terms of this Agreement, the policies and procedures of Company and Vendor(s), and in compliance with applicable state and federal laws in effect from time to time, and FDA regulations, including establishing and implementing any required control, record keeping and reporting procedures. Contractor agrees to use its best efforts to cause its officers, employees, agents, and or contractors to comply with the provisions of this paragraph. Contractor agrees to comply with the General Training and Arrangements Training obligations as described and set forth in the CIA. Contractor shall:  (a) use its best efforts to cause its officers, employees, agents and or contractors to distribute copies of the Vendor(s)' Code of Conduct, the Vendor(s)' Health Care Compliance Program(s) (the "HCC Programs"), and other relevant Vendor(s) policies and procedures, including, without limitation, those policies and procedures addressing the prevention of Healthcare fraud and abuse; (b) abide by and comply with the requirements of such Code of Conduct, the HCC Programs and other relevant Vendor(s) policies and procedures and all applicable laws and regulations; (c) use its best efforts to cause its officers, employees, agents and/or contractors to abide by and comply with the requirements of such Code of Conduct, the HCC Programs and other relevant Vendor(s) policies and procedures and all applicable laws and regulations; (d) distribute information about the Vendor(s) program for reporting suspected incidents and/or concerns related to the HCC Programs and/or healthcare fraud and abuse, including without limitation, "hotline" phone numbers and Vendor(s)' contacts for the reporting of such matters; (e) ensure its officers, employees, agents and/or contractors are trained regarding Federal Anti-Kickback Statutes through participation in training provided or offered by either Vendors, the Company, or a third party acceptable to the Company; and (f) screen officers, employees, agents and/or contractors to ensure that such individuals are not Ineligible Persons as described at

6

Section III.G of the CIA. Contractor shall, as requested by Vendor(s) and/or Company, certify that it and/or its officers, employees, agents and contractors have received a copy of the code of conduct, HCC Programs and relevant Vendor(s) policies and procedures, have received Anti-Kickback Statute training. Contractor further certifies that it has conducted screening of its officers, employees, agents, and contractors and excluded any Ineligible Persons. Contractor shall operate in compliance with all applicable state and federal laws in effect from time to time, including FDA regulations, establishing and implementing any required control, record keeping, marketing and sale of Products procedures. Contractor shall provide Company with such information and data as may be requested by Company pursuant to this Agreement, which such information shall be accurate to the best of Contractor's knowledge. Contractor further agrees to report to Company any complaints received from any source with respect to Products, including without limitation, report of adverse events involving the products and shall engage in any training the Company determines is necessary related thereto. Contractor agrees to use its best efforts and to cause its officers, employees, agents and contractors to comply with the provisions of this Paragraph.

13. **Contractor Representations and Warranties.** Contractor represents and warrants that Contractor has not and will not engage in any advertising or promotion of any of the Vendor(s)' or Affiliate(s)' products without prior consent from the Company, nor will Contractor develop, create or use any other promotional literature or material·than what is provided by Company, Vendor(s) or Affiliate(s). Contractor represents and warrants that Contractor will promote the Products for their intended uses and will not make any representations or warranties for any products other than those authorized by the Company, Vendor(s) or Affiliate(s). Contractor also represents and warrants that Contractor is not bound by any other contract, agreement or obligation with any other person or entity that would prevent Contractor from fully performing his/her duties under this Agreement and further agrees to abide by the terms of any existing agreements between Contractor and any prior employer or entity.

14. **Subcontractor Obligations.** To the extent that Contractor employs or contracts with individuals or entities (hereinafter defined as "Subcontractors") to carry out the duties associated with marketing or selling the Products discussed herein, said Subcontractors shall be subject to and bound by each and every covenant set forth herein, including but not limited to covenants addressing competition, confidentiality, goodwill, interference and training. Contractor expressly agrees that every Subcontractor working on Contractor's behalf shall sign an agreement with Contractor containing the aforementioned covenants which shall run to the benefit of the Company and Vendor(s). In the event that any Subcontractor ceases to become affiliated with Contractor or breaches or threatens to breach any of the aforementioned covenants, Contractor shall immediately notify Company and shall, in the case of breach or attempted breach, immediately seek injunctive relief against the offending Subcontractor. The Company and Vendor(s) shall have the right to join in any injunction or enforcement action and Contractor may not object to the same. Contractor must obtain assurances and agreements from all Subcontractors indicating their assent to the terms in this Paragraph.

7

**Exhibit 1, Page 7 of 12**

Contractor further represents and warrants that all Subcontractors will be provided with and will attend appropriate training as required by Company and its Vendors or Affiliates.

15. **Waivers**. No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the party against whom such waiver is sought to be enforced. No waiver of any default or breach hereunder, nor any delay or partial exercise of any right or remedy arising as a result of any such default or breach, shall constitute a waiver of any other default or breach whether similar or otherwise, nor shall it prevent or preclude the non-breaching party from exercising such right or remedy upon the occurrence of a subsequent default or breach.

16. **Breach/Remedies**. Actual, compensatory and/or punitive damages are available for breach of any term of this Agreement. Nothing herein shall serve to diminish or eliminate any otherwise available equitable remedy, including without limitation an injunction against further violations.

17. **Third Party Beneficiaries**. Contractor agrees and acknowledges that the Vendor(s) have asked the Company to obtain Contractor's assent to the terms herein, and that the Vendor(s) are third party beneficiaries of the rights of Company hereunder and may enforce such rights directly by the initiation of any legal or equitable proceeding against Contractor or by seeking any other remedy under applicable laws or regulations.

18. **Severability**. If any provision of this Agreement shall for any reason be held invalid, unenforceable or contrary to public policy, whether in whole or in part, the remaining provisions shall not be affected by such holding, and the Agreement shall be carried out as nearly as possible according to its original terms and intent, unless to do so would substantially and unfairly alter the respective rights and obligations of the Parties.

19. **Insurance.** During the term of this Agreement, Contractor shall maintain in full force and effect, in a form and amount satisfactory to Company, workers' compensation insurance covering Contractor and its employees and contractors, motor vehicle liability insurance covering any travel by Contractor and its employees or contractors, and any other insurance coverage necessitated by rendering services under this Agreement.

20. **Notices**. All notices and other communications made under this Agreement shall be given in writing and sent or delivered using the following contact information:

**Contractor:**

| | |
|---|---|
| **Name:** | Robert Schmidt |
| **Address:** | 8943 Chestnut |
| | Lenexa, KS 66220 |
| **Phone:** | 913-484-6788 |
| **Email:** | robert@schmidtmedical.com |

8

**Company:**

Name:                     Raridon & Associates Orthopedics, Inc.
Address:                   10170 Hickman Court
                          Clive, IA 50325
Phone:                    515-276-6962
Email:                    sraridonjr@raridon.org

21.    **General Provisions.**

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa without regard to choice of law principles. The Parties agree that any legal action, suit or proceeding seeking to enforce any provision of this Agreement shall be instituted and adjudicated solely and exclusively in any court of general jurisdiction in Des Moines, Iowa or in the United States District Court having jurisdiction in Des Moines, Iowa. The Parties agree that venue will be proper in such courts and waive any objection which they may have now or hereafter to the venue of any such suit, action or proceeding in such courts, and each hereby irrevocably consents and agrees to the jurisdiction of said courts in any such suit, action or proceeding.

(b)    This Agreement may not be modified or amended, nor may any provision hereof be waived, without the prior written consent of the party to be bound by such modification, amendment or waiver.

(c)    This Agreement is binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, representatives, successors and permitted assigns. The Covenants and obligations herein (i) are assignable in whole or in part, and shall be automatically assigned in whole or in part, to Vendor(s) upon Vendor(s)' request without Contractor's consent; and (ii) are for the benefit of the Company and Vendor. Vendor shall also have the right and sole discretion to directly enforce such provisions in Company's name and for the benefit of Company. This Agreement may not be assigned by Contractor without the prior written consent of Company, which may be withheld for any reason. Company may not assign this Agreement to any person or entity other than a Vendor without the prior written consent of Contractor, which shall not be unreasonably withheld.

(d)    This Agreement supersedes and replaces all prior agreements or understandings, whether oral or written, with respect to the subject matter hereof.

(e)    The captions herein are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections, nor in any way affect this Agreement.

(f)    This Agreement may be executed in one or more counterparts, all of which shall together constitute one and the same instrument and shall become effective when one

9

or more counterparts have been signed by each and every party hereto and delivered to each and every other party hereto.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

CONTRACTOR, Robert Schmidt

_____    12-22-15
                                     _____
                                     Date

RARIDON & ASSOCIATES ORTHOPEDICS, INC.

By:_____    1/10/16
Scott Raridon, Jr. President           _____
                                       Date

10 **Scanned by CamScanner**

## Exhibit 1
**Products, Accounts and Territories**

**"Products" shall mean the following items:**

**Hips, Knees, Shoulders, OR Products, Cement
Synthes Power Tools, Biocomposites**

**"Accounts" and "Territories"  assigned to Contractor shall be:**

| | | |
|---|---|---|
| **Stormont Vail Hospital** | **Topeka, KS** | **All Surgeons** |
| **Centerpoint Hospital** | **Independence, MO** | **Dr. Greiner**<br>**Dr. Hummel**<br>**Dr. Krempec**<br>**Dr. Ballard** |
| **North Kansas City Hospital** | **Kansas City, MO** | **Dr. Krempec**<br>**Dr. Witte**<br>**Dr. Cornett**<br>**Dr. Justice**<br>**Dr. Paul** |
| **St. Luke's East Hospital** | **Kansas City, MO** | **Dr. Krempec** |
| **Kansas City Orthopaedics Inst.** | **Leawood, KS** | **Dr. Gurba** |
| **Liberty Hospital** | **Liberty, MO** | **Dr. Monahan**<br>**Dr. Steinbronn** |
| **Newman Regional Hospital** | **Emporia, KS** | **All Surgeons** |
| **Mercy Hospital** | **Manhattan, KS** | **All Surgeons** |
| **Manhattan Surgical** | **Manhattan, KS** | **All Surgeons** |
| **Providence Medical Center** | **Kansas City, MO** | **All Surgeons** |

**Territory includes all accounts paid on most recent commission statement**

11

**Exhibit 1, Page 11 of 12**

**<u>Exhibit 2</u>**
**Compensation**

**Depuy Ortho Joint Reconstruction – 9%**
**Synthes Power Tools – 9%**
**Biocomposites – 15%**

**Contractor will pay $3,000/month of guaranty for Ross Nichols.  Monies to come from**

**Depuy Ortho Joint Recon sales within the territory – with the exception of Stormont**

**Vail/Topeka**

12



## MIDWEST MEDICAL RESOURCES, INC.
## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made and entered into as of the 1st day of July, 2021 (the "Effective Date") by and between MIDWEST MEDICAL RESOURCES, INC., a Missouri corporation (hereinafter "MMR") and Schmidt Medical, Inc. ("Sales Representative") and Bob Schmidt ("Manager"), jointly and severally (Sales Representative and Manager, if any, are hereinafter collectively referred to as "Contractor").

**Recitals**

MMR is a distributor of sports medicine and rehabilitation orthopedic and other medical Products, devices and supplies to health care providers and the medical trade and healthcare market generally in the States of Missouri, Kansas, Oklahoma, Iowa and Nebraska and other areas of the country.

Contractor is an independent contractor and has agreed to sell MMR's products upon the terms and conditions set forth in this Agreement.

**Article I:      Appointment as Independent Contractor as Sales Representative; Contractor's Manager for Entity Contractor.**

1.1      MMR engages and appoints CONTRACTOR, and CONTRACTOR accepts the appointment by MMR, as MMR's sales representative to solicit sales of MMR Products.

1.2      CONTRACTOR shall act as an independent contractor at all times.  This Agreement does not and is not intended to create in any manner an employer-employee relationship, franchise, or agency between and among the parties.  CONTRACTOR is not authorized to enter into contracts or other business arrangements for or on behalf of MMR or its manufacturers/vendors, or to create any obligation, express or implied, for or on behalf of MMR or its manufacturers/vendors, accept payment of any obligation due or owed to MMR or its manufacturers/vendors, or accept service of process for MMR or its manufacturers/vendors.

1.3      Contractor agrees that:

a.      The methods to be employed by Contractor shall be decided upon by Contractor and not by MMR and MMR shall not have any control over Contractor except to perform the work according to this Agreement.

b.      Contractor shall pay all of its Taxes including, but not limited to, amounts due as a result of the Federal Insurance Contributions Act ("FICA"), the Federal Unemployment Act ("FUTA") and federal or state income tax in regard to Contractor's earnings.

**EXHIBIT**

**2**

exhibitsticker.com

DEFENDANT 000180

Exhibit 2, Page 1 of 22



c.    MMR does not have mandatory rules of control over Contractor.

d.    MMR shall not make appointments for Contractor or determine whether appointments are kept.

e.    Contractor shall not be treated as an employee with respect to the services performed hereunder for federal, state or local tax purposes.

f.    All of Contractor's remuneration for the services performed hereunder will be determined by the payment provisions of this Agreement rather than by the number of hours worked.

1.4    Appointment of Manager.

If CONTRACTOR is a corporation, a limited liability company, a partnership or other business entity ("entity Contractor"), then CONTRACTOR appoints Bob Schmidt, and Schmidt Medical, Inc. accepts the appointment (as **Manager**), as the individual who shall have and retain day-to-day supervisory responsibility for the business operations of CONTRACTOR, and to represent CONTRACTOR when dealing with MMR. Manager is one of the principals and owners of CONTRACTOR and a signatory to this Agreement, and as such, his continued services as the CONTRACTOR Manager are a material component of this Agreement. Further, the parties agree that the Manager shall be designated MMR's Business Development and Commercial Liaison. The replacement, substitution, reassignment, termination, transfer or reduction of CONTRACTOR'S Manager without the prior written consent of MMR shall constitute a material breach of this Agreement. Sales Representative and Manager shall be jointly and severally liable for the performance of all obligations of CONTRACTOR hereunder.

**Article II:    Term and Commission.**

2.1    Term.    This Agreement shall commence on the Effective Date and continue in full force and effect until terminated as provided herein. Notwithstanding the foregoing, either party shall have the right to terminate this Agreement without cause upon thirty (30) days prior written notice to the other.

2.2    Commission.    Subject as provided elsewhere in this Agreement and if and only if, Contractor and Contractor's Manager are not in breach of this Agreement, to pay Contractor a commission for compensation for sales and services made and rendered on behalf of the MMR based on Products sold by the Contractor and delivered to customers within the Contractor's Territory. MMR will pay commissions to the Contractor at a rate or rates set forth in **Schedule 3.0** Commissions may be amended by MMR in its discretion from time-to-time by publication of an amended **Schedule 3.0** or by other, written communication to Contractor (subject to Contractor's right to terminate this Agreement pursuant to Section 2.1). Commissions payable to the Contractor shall be computed on the net amount actually collected by the MMR on invoices rendered by the MMR for sales of Products effected by the Contractor, taking into account price lists published by the manufacturer, vendor or carrier of the Products, less credit memos, freight and transportation costs, insurance, discounts, and any applicable sales or other taxes. In the case

2

OP 3027255.4

DEFENDANT 000181

Exhibit 2, Page 2 of 22



of insurance billings, if the amount actually paid by the insurance carrier to the manufacturer or the carrier of the products sold is less than the invoiced amount, the Contractor's commission shall be based on the actual commission paid by the manufacturer or the carrier to MMR rather than the invoiced amount. Except as may otherwise be provided in **Schedule 3.0**, Contractor is not guaranteed a minimum commission or a minimum compensation.

    2.3    Payment Contingencies.    MMR's obligations to pay compensation to Contractor are contingent upon the following conditions:

    (a)    Contractor's faithful adherence to this Agreement, including the noncompete and nonsolicitation provisions.

    (b)    Contractor does not file for bankruptcy, receivership, or is not liquidated, dissolved, or sold to, acquired by or merged with any competitor or other business; and,

    (c)    Contractor returns of all product samples upon request or termination of this Agreement pursuant to Section 4.14.

## Article III:    Products and Territory.

    3.1    Products.    The term "Products" as used in this Agreement refers only to the Products identified in **Schedule 3.1** ("**Products**"). *If no specifically identified Products are assigned to Contractor in Schedule 3.1, then Contractor is authorized to market and sell all MMR products. If Scheduled 3.1 does not specifically state that the Products assigned to Contractor's are exclusive or available only to Contractor, then the Products shall be nonexclusive and available to other MMR employees and sales representatives until changed by written agreement with MMR.*

    3.2    Territory.    Contractor agrees to represent MMR as in independent contractor to solicit sales of Products only in the Territory identified in **Schedule 3.2** ("**Territory**"), subject to and in accordance with the terms and conditions of this Agreement. The term "Territory" may, but need not be, be defined in terms of, or to include, specific clinics, hospitals and physicians. Contractor agrees that MMR may change the Territory at any time upon thirty (30) days' notice to Contractor (subject to Contractor's right to terminate this Agreement pursuant to Section 2.1). *If a Territory is not specifically identified in Schedule 3.2 for assignment to Contractor, then Contractor is authorized to market and sell wherever MMR conducts its business, subject to any territory restrictions imposed by the manufacturer, suppliers and vendors of MMR products. If Schedule 3.2 does not specifically designate Contractor's Territory as exclusive, then Contractor's Territory shall be and remain nonexclusive and open to other MMR employees and sales representatives until the Territory is otherwise changed by written agreement with MMR.*

    3.3    Neither Contractor nor any of Contractor's affiliates (as that term is defined herein) shall sell or solicit sales of Products or services or represent in any capacity businesses (in any form) that are competitive with the Products and services of MMR or the manufacturers/vendors it represents without prior written approval from MMR. MMR and its manufacturers/vendors reserve the right to determine which Products and services are competitive with the Products and

OP 3027255.4

DEFENDANT 000182

Exhibit 2, Page 3 of 22



services offered by MMR and its manufacturers/vendors, provided that such determinations must be reasonable. Subject to the terms, limitations, restrictions and conditions of this Agreement, CONTRACTOR may engage in any other, non-competitive business activity in or outside the Territory. CONTRACTOR's engagement under this Agreement is limited to the Products listed on **Schedule 3.1.** *Unless otherwise provided in this Agreement,* CONTRACTOR shall not solicit sales or sell the Products for shipment outside the Territory or solicit or sell the Products outside the Territory.

3.4    Products not identified on **Schedule 3.1**, including other products currently sold by MMR and its manufacturers/vendors, or products acquired, developed or obtained by MMR, or by its existing manufacturers/vendors or new manufacturers/vendors acquired in the future ("After-acquired Products") may, but need not, be offered to CONTRACTOR as MMR, in its sole discretion, shall determine. MMR and its manufacturers/vendors reserve the right to sell Products assigned to Contractor in **Schedule 3.1** in Contractor's Territory directly to national, regional and governmental accounts or through national or regional distributors; provided, however, that CONTRACTOR shall be entitled to a commission (as set forth in **Offer Letter**) on such sales of Products (limited, as to regeneration Products, to certain sales of such Products) in the Territory. If one or more regeneration products are included as Products in **Schedule 3.1**, CONTRACTOR agrees that its rights under this Agreement as to such Products are entirely non-exclusive and that MMR or its manufacturers/vendors may, whether by employed sales representatives or through independent sales representatives, promote and sell, or arrange for the promotion and sale of such regeneration Products in the Territory. CONTRACTOR shall receive commissions on sales of regeneration Products made in the Territory by other persons under the limited circumstances set forth in **Offer Letter**.

3.5    CONTRACTOR agrees not to compete with the sales channels of MMR or its manufacturers/vendors in the Territory without the prior written consent of MMR in each instance. CONTRACTOR agrees to refer to MMR, and to process sales through the insurance billing facilities of MMR or the manufacturers/vendors designated by MMR, each opportunity presented to CONTRACTOR to sell a Product directly to the consumer with billing to the consumer's insurance MMR; provided, that such obligation of CONTRACTOR shall apply only to cases in which MMR or its designated manufacturer/vendor has a contract with the applicable insurance MMR which is in effect. CONTRACTOR agrees to refer to MMR, or to MMR's manufacturers/vendors, as the case may be, for OfficeCare or other similar programs, each opportunity for a stock and bill arrangement, unless MMR or its vendor first declines to institute the OfficeCare or similar program.

**Article IV.    Scope of Duties and Obligations of Contractor.** CONTRACTOR agrees

4.1    To sell and solicit sales of Products and otherwise work on behalf of the MMR only in the Territory described in **Schedule 3.2**.

4.2    To comply with laws (state and federal) applicable to CONTRACTOR and the conduct of its business in the Territory; to take such lawful measures as may be required to protect MMR and its manufacturers/vendors from claims, liabilities and lawsuits; and, to operate with the highest degree of business and professional integrity.

4

OP 3027255.4

DEFENDANT 000183



4.3    To comply with the Terms and Conditions of Sale and Sales Policies and Procedures and all promotional policies adopted or issued by MMR's manufacturers, vendors and suppliers of the Products.

4.4    To ensure that CONTRACTOR and its affiliates make representations and communications to customers that are true, accurate, complete, and consistent with the labeling of the Products.

4.4    Not to modify, repackage, adulterate, misbrand, alter or add labels to or remove labels from any Product.

4.5    To take no action or issue any statement which is detrimental to or disparaging of MMR or it manufacturers/vendors.

4.6    To submit advertising and participation by CONTRACTOR in public exhibitions of the Products and the use of MMR's and its manufacturers/vendors names, trademarks, and logos to MMR and its manufacturers/vendors, respectively, for approval prior to use, dissemination or participation, which consent shall not be withheld unreasonably.

4.7    To comply with the policies and procedures adopted and amended by MMR from time-to-time, and to comply with instructions from MMR and its manufacturers/vendors, including instructions regarding billing practices, shipments of Products, and handling of claims.

4.8    To maintain an inventory of deliverable Products sufficient to promote and solicit orders for the Products\Inventory (which may be held at participating hospitals). Notwithstanding the foregoing, unless a participating hospital accepts responsibility for the care and custody of such Products\Inventory, Contractor shall be responsible for the risk of loss and damage to such Products\Inventory, and upon termination of this Agreement, CONTRACTOR will make arrangements for the return all unsold Products\Inventory to MMR or its manufacturers/vendors, respectively, as directed by MMR.

4.9    Without limiting the foregoing, CONTRACTOR's services and duties hereunder shall include (a) analysis of the MMR's marketing efforts within CONTRACTOR's Territory, (b) development of specific marketing programs on behalf of the MMR within the CONTRACTOR's Territory, (c) promotion and solicitation of orders for the purchase of Products within the CONTRACTOR's Territory, and (d) follow-up, analysis and reporting of the MMR's marketing programs and efforts within the CONTRACTOR's Territory.

4.10    To use only the sales contract and order forms which are supplied or approved by MMR in advance for the sales of its goods and services, and to follow and abide by all instructions, policies and procedures established by MMR, orally or in writing, from time to time, for the completion, signing and processing of such contracts and orders, for the collection of down payments and other payments, for the processing of customers' copy, for the delivery of Products to customers and the collection of final payments from customers.

4.11    To maintain for MMR a current and up-to-date file in paper and in a computer database file using database software approved by MMR, listing all MMR customers and potential

5

OP 3027255.4

DEFENDANT 000184



MMR customers in the Territory serviced by CONTRACTOR (the paper and computer database and all records and information therein collectively referred to as "Files"). The Files shall be the property of MMR solely and shall be subject to the restrictions set forth in Article X of this agreement. The Files shall contain at least the following information for each customer and potential customer, in addition to any other information requested by MMR: all sales and shipments of the Product, date of each contact, MMR contacted, name of person contacted, details of usage, history and current status as a customer of MMR, attitude toward MMR's Products and services, and when customer might need more of MMR's Products or services. At the request of the MMR, the CONTRACTOR shall make available to the MMR for inspection and/or copying all of the Files, books and records maintained by the CONTRACTOR hereunder or otherwise relating to the MMR and the Business.

4.12    To report all product complaints and potential reportable events to MMR and if directed by MMR, to the vendor affected by the complaints and events, consistent with the Food and Drug Administration's (FDA) regulatory obligations for distributors and consistent with the standard operating procedures of MMR and its manufacturers/vendors.

4.13    To provide as and when required, detailed information on product and shipping records in the event of a recall or field corrective action.

4.14    Samples. Contractor agrees that samples delivered to Contractor by MMR ("MMR Samples"), if any, or by manufacturers ("House Samples"), if any, are owned by MMR and the manufacturers, respectively. Upon request by MMR or the Manufacturer-owner, which can be made at any time, Contractor shall return all MMR Samples and House Samples in good condition or pay the cost of lost or damaged samples to MMR or to the manufacturers-owners. Contractor also shall pay any and all delinquent fees and penalties imposed for failure to timely return MMR and House Samples. The MMR shall have the right, on reasonable notice, to inspect and audit Contractor's MMR and House Samples.    Upon the execution of this Agreement, Contractor shall deliver to MMR a complete inventory of all samples, kits and other inventory not owned by Contractor which is to be sold or used under the terms of this Agreement. Within  fifteen  (15) days after termination of this Agreement, Contractor shall first inventory and then return to MMR or applicable manufacturers as directed, all MMR Samples and House Samples. Contractor authorizes MMR to deduct from compensation otherwise owed to Contractor the amount(s) necessary to compensate MMR or manufacturers for samples which are damaged, lost or not timely returned. All compensation and reimbursement due or not yet paid to Contractor on termination, as adjusted for lost and damaged samples, shall be paid upon delivery of the inventory and all samples.

Article V.    MMR Obligations and Duties. MMR agrees

5.1    To pay Contractor compensation as provided in Schedule 2.1.

5.2    To sell Products on orders solicited by Contractor in accordance with published price lists in effect at the time of sale. The published price lists includes price lists published by MMR, or by the manufacturer, vendor or carrier of the Products. Written notice of changes to price lists will be given to Contractor as changes become available.    MMR or its manufacturers/vendors may accept or refuse any order for Products and will not be bound by any

6

OP 3027255.4

DEFENDANT 000185



order until it is finally accepted by MMR and its manufacturers/vendors. MMR shall not be responsible or liable for any loss or damage caused by or arising from a refusal to accept orders or delays in shipments of Products.

5.3    To supply Contractor a reasonable amount of sales contracts and order forms. Contractor shall not use any other form of order or contract, unless approved by company in writing in advance. Contractor shall follow and abide by all instructions, policies and procedures established by MMR, orally or in writing, from time to time, for the completion, signing and processing of such contracts and orders, for the collection of down payments and other payments, for the processing of customers' copy, for the delivery of goods to customers and the collection of final payments from customers. Contractor shall not sign any contract, order form or other document obligating MMR without the prior written consent of MMR. Contractor shall submit all orders and contracts to an officer or a Sales Manager of MMR for approval and signature.

**Article VI.    Indemnification.**    CONTRACTOR (including the Manager when appointed under this Agreement), agree to indemnify and hold MMR harmless from and against all claims, damages, losses and expenses, including attorneys' fees and court costs that arise out of any breach of this Agreement, or the negligence, intentional or wrongful acts, or any other misconduct by CONTRACTOR and the Manager and their agents and affiliates. MMR agrees to indemnify and hold CONTRACTOR and MANAGER harmless from and against all claims, damages, losses and expenses, including attorneys' fees and court costs that arise out of MMR's breach of this Agreement, or the negligence, intentional or wrongful acts, or any other misconduct by MMR and its agents and affiliates.

**Article VII.    Termination.**

7.1    This Agreement may be terminated by MMR immediately by written notice to Contractor upon the occurrence of any of the following Terminating Events:

(a)    Conviction of Contractor or Manager or other officer of Contractor of a felony.

(b)    Involuntary bankruptcy of CONTRACTOR or MANAGER that is not terminated within thirty (30) days of the initiation of those proceedings, or the insolvency or voluntary bankruptcy of CONTRACTOR or CONTRACTOR'S MANAGER.

(c)    Breach of Article X: (i) Non-Competition Agreement; Covenant Not to Compete or Solicit Customer Upon Termination of Agreement, (ii) the Covenant not to Disclose Proprietary Information, or (iii) the Confidentiality Agreement.

(d)    Failure of CONTRACTOR OR MANAGER to comply with the business conduct or ethics policies adopted by MMR or the reasonable belief by MMR that such failure has occurred.

(e)    Breach of the Policies established by MMR or its manufacturers/vendors that causes harm or injury to MMR, its manufacturers/vendors which is not remedied within ten (10) days after written notice thereof is given to CONTRACTOR.

(f)    Any material change of ownership or control of CONTRACTOR or a business

7

OP 3027255.4

DEFENDANT 000186

Exhibit 2, Page 7 of 22



division thereof (whether by way of voting or contracts rights or otherwise), without the prior written consent of MMR, which consent will not be withheld unreasonably.

(g)    A material breach of this Agreement by CONTRACTOR or MANAGER.

(h)    At MMR's option, the sale at any time of a majority interest in MMR or its assets at any time, or any liquidation, dissolution, involuntary bankruptcy, insolvency or voluntary bankruptcy proceeding brought by or against MMR (provided that Contractor shall be paid all earned but unpaid commissions, as required by applicable law).

(i)    Any change in or amendment to MMR's distributorship and sales contract with any manufacturer, vendor or supplier of the Products which substantially reduces MMR sales revenues, territory, or accounts or customers, or imposes burdens, obligations and duties upon MMR which are not, in MMR's sole discretion, profitable or in MMR's best interest (provided that Contractor shall be paid all earned but unpaid commissions, as required by applicable law).

(j)    The failure or inability of MMR's principals, Edward Lewis and John Tarantino, to remain with or continue to own MMR by reason of incapacity, disability or any other reason (provided that Contractor shall be paid all earned but unpaid commissions, as required by applicable law).

(k)    The death of the Manager.

8.2    Without intending to limit the terms and conditions set forth elsewhere in this Agreement, in the event Manager is afflicted with a physical, emotional or mental condition which in the reasonable judgment of the MMR's Board of Directors or president prevents Contractor from performing the duties and obligation imposed on the Contractor hereunder ("Incapacity"), MMR may terminate this Agreement at any time by delivery of written notice of termination to the Contractor, and Contractor's Compensation shall be limited to the amount paid prior to the date on which Manager is determined to be unable to perform his duties by reason of incapacity.

8.3    The failure to meet or satisfy any one of the conditions in Section 5.2(b), or the occurrence of any one the Terminating events identified in Section 8.1 (a), (b), (c), (d), (e), (f), (g), shall terminate MMR's obligations to Contractor under this Agreement, and the Compensation due Contractor shall be limited to the amount paid prior to the date of termination, less any sums due MMR under this Agreement or applicable law.

### Article IX.    Return Of Property.

At the termination of this Agreement with the MMR, Contractor (including Manager when applicable) shall immediately return to the MMR all MMR Files and Confidential Information, including, but not limited to, all of the MMR's customer lists, call lists and other customer data, trade secrets, information relating to Products, price lists and strategies, business plans and strategies, marketing plans and strategies, order, shipping information, contracts, memoranda, notes, records, technical data, and other proprietary items and confidential information, without retaining any copies or reproductions thereof. Upon request of the MMR, the Contactor or personal representative of the Manager's estate, as the case may be, shall execute a certificate

8

OP 3027255.4

DEFENDANT 000187



addressed to MMR which shall confirm compliance with the foregoing requirement.

**Article X.**    **Non-Competition Agreement:  Covenant Not to Compete or Solicit Customer Upon Termination Of Employment; Confidentiality Agreement.**

10.1    Covenant Not to Compete or Solicit Customers.    CONTRACTOR   covenants and agrees that the CONTRACTOR shall not, during the term of this Agreement and for a period of ONE (1) YEAR thereafter (beginning on the termination of this Agreement, regardless of the reason for termination), directly or indirectly, for the CONTRACTOR'S own account, or for the account of others (excepting only MMR and, in such event, then only after first obtaining MMR's prior written consent),  whether as an individual, partner, sales representative, agent, stockholder, director, officer, independent contractor, consultant, creditor, financier, principal, or in any other capacity whatsoever,

(a)     Own, manage, operate, control, be employed by, participate in, consult with, set up, establish, act as an independent contractor for, carry on, conduct, finance, or acquire any business (whether operating as a sole proprietorship, corporation, partnership, limited liability company or otherwise) that is a Competing Business with MMR and is either located or operating (i) within the Non-Compete Territory (defined below), or (ii) within a 50-mile radius of any MMR customer (whether or not located within the Non-Compete Territory) with whom Contractor has dealt, conducted business or serviced at any time during the term of this Agreement.

(b)     Directly or indirectly solicit or attempt to solicit, take away or attempt to take away, or otherwise divert or attempt to divert, any  customer of MMR or the business or patronage of  (i) any MMR customer with whom Contractor has dealt or conducted business, or serviced, during the term of this Agreement, regardless of the location of the account or customer, (ii) any MMR customer who or which is located or operating in the Non-Compete Territory, or (iii) those prospective MMR customers who are located or operating within the Non-Compete Territory  and from whom Contractor or other employees, sales representatives or agents of MMR solicited business within twelve (12) months prior to termination of this Agreement.

(c)     Work for a customer of MMR whose business was being sought or solicited during the last twelve (12) months of CONTRACTOR'S work for MMR under this Agreement, if the work includes providing, or arranging for, services and sales of products that are the same as, or similar to, those provided by MMR.

(d)     Solicit, interfere with, employ, or endeavor to employ any MMR employees or agents, or sales representatives acting as independent contractors for purposes of selling any of the services and products offered by MMR.

9

OP 3027255.4

DEFENDANT 000188



(e)    Provide services or expertise or otherwise assist any person, firm or corporation, limited liability company, partnership or other entity in any of the prohibited activities described in foregoing subparagraphs (a) through (d) within (i) the Non-Compete Territory with whom Contractor has dealt, conducted business or serviced at any time during the term of this Agreement or (ii) within a 50-mile radius of any MMR customer (whether or not located within the Non-Compete Territory) with whom Contractor has dealt, conducted business or serviced at any time during the term of this Agreement.

10.2   Contractor agrees that the time, geographical area, and scope of activity limitations contained in the foregoing are necessary, reasonable, and properly required for the adequate protection of (a) MMR's relationships with established customers, (b) MMR's goodwill and company loyalty, (c) MMR's investment in its business, in the sale and solicitation for sales of the products and services by MMR within the Non-Compete Territory, and other legitimate business interests of MMR, and (d) MMR from the standpoint of preventing former independent contractors, Sales Representatives, managers and others from capitalizing on personal contacts, confidential information and inside information gained during employment with MMR. Contractor further agrees and acknowledges that (a) the Non-Competition Agreement is one of the inducements for MMR entering into this Agreement and, but for the Contractor's willingness to be bound by the terms of this Agreement, MMR would not execute this Agreement or otherwise contract with or engage Contractor without it and, (b) the Contractor's services are of a special and unusual character that have a unique value to MMR, the loss of which cannot be adequately compensated by damages in an action at law and, if used in competition with MMR, could cause serious harm to MMR.

10.3   Further, MMR and the Contractor also recognize that an important part of the Contractor's duties will be to develop goodwill for MMR through the continuation and development of Contractor's personal contacts with customers, agents and others having business relationships with MMR, and that there is a danger that this goodwill, a proprietary asset of the company (MMR's), may follow Contractor if and when Contractor's relationship with MMR is terminated. Contractor also acknowledges that adherence to the Non-Competition Agreement contained in this Agreement will not preclude the Contractor from earning a livelihood after the termination of this Agreement. Without intending to limit the generality of other terms and provisions of this Agreement, the terms and provisions of the Non-Competition Agreement are severable, and if any one or more provision may be determined to be illegal, void, or otherwise unenforceable, in whole or part, the remaining provisions, and any partially unenforceable provision to the extent enforceable in any jurisdiction, shall, nevertheless, be binding and enforceable against Contractor. To the extent that any restriction or provision contained herein shall be held, found or deemed to be unreasonable, overly broad or ambiguous, unlawful or unenforceable by any court or other authority of competent jurisdiction, sufficient to permit enforcement thereof, then Contractor hereby expressly requests, authorizes, empowers and consents to the modification of such restriction or provision to the extent necessary to permit enforcement to the maximum extent permitted by applicable law.

10.4   If Contractor is offered employment or the opportunity to enter into any business

10

OP 3027255.4

DEFENDANT 000189



venture in any capacity (whether as an owner, contractor, investor, partner, or otherwise) or employment with another business that is a Competing Business with MMR while the restrictions described in this Article are in effect, the Contractor agrees to inform the potential employer, partner, co-owner and/or others involved in managing the business of its, his or her obligations under this Article and also agrees to provide such person or persons with a copy of this Article. Contractor also authorizes MMR to provide copies of this Article to any of the persons or entities described above and to make such persons aware of the obligations under this Article.

    10.5    <u>Covenant Not to Disclose Confidential Information</u>.

(a)    For purposes of this Agreement, the term "Confidential Information" means any (i) confidential, proprietary and or secret knowledge or information about or belonging to MMR; (ii) MMR's trade secrets and customer and vendor lists; (iii) information about the MMR's existing strategies concerning the sales and delivery of products, new products and design changes to existing products, confidential pricing and product information, historical sales information, billing procedures, information relating to price discounts and pricing strategy, marketing strategies and materials, support information for MMR's products; (iv) non-public information pertaining to any MMR Customer and its needs or desires with respect to the products and services offered by the MMR, including, but not limited to, names of Customers and their representatives, proposals, contracts and their contents and parties, data provided to MMR by a Customer, the type, quantity and specifications of Products and other non-public Customer information; (v) information concerning the acquisition and development of any trademark, copyright, patent or other proprietary information; and (vi) information designated by MMR as confidential or proprietary now or in the future (individually and collectively, the "Confidential Information").

(b)    The Contractor agrees that MMR's Confidential Information (whether developed or acquired before or after the date of this Agreement) is secret, confidential, unique and valuable, and its unauthorized disclosure will cause irreparable injury to MMR. Contractor shall hold the Confidential Information in the strictest of confidence, use it solely for the furtherance, protection and development of MMR's business and in the performance of Sale Representative's duties as a sale representative of MMR, and not disclose it to anyone or otherwise deliver, reproduce or disseminate it, unless expressly permitted by this Agreement or otherwise directed in writing by MMR. This covenant not to disclose Confidential Information contained shall not terminate upon the termination of the Sales Representative's employment by MMR, but on the contrary shall survive such termination regardless of the reason therefore for a period of five (5) years following the termination of the Sales Representative's employment with MMR.

(c)    Contractor shall not acquire or become entitled to any ownership interest in

11

OP 3027255.4

DEFENDANT 000190

Exhibit 2, Page 11 of 22



any Confidential Information, even if Contractor participates in, or acquires or develops it for MMR.

10.6    Confidentiality Agreement. Except for the limited disclosure permitted in Section 10.4, this Agreement and all of the terms, covenants and conditions set forth herein, including, without limitation, the Non-Competition Agreement and the covenant not to disclose Proprietary Information, shall be deemed confidential in nature and subject to a covenant of confidentiality by and between MMR and the Sales Representative.    In furtherance of such covenant of confidentiality and without intending to limit the foregoing, Contractor shall (a) treat this Agreement and all of the terms, covenants and conditions set forth herein as private and privileged, (b) not at any time either directly or indirectly disclose, divulge, make known, permit the disclosure of, release, disseminate, transfer, or otherwise communicate, whether orally or by any other means, any of the terms, covenants, and conditions set forth in this Agreement to any other person or entity, whether governmental, fictitious or individual, excepting only to the Sales Representative's paid attorneys, accountants and similar professional advisors or pursuant to subpoena or other judicially mandated directive, order or decree, and (c) not, without intending to limit the scope of 10.5 (b) above, at any time either directly or indirectly disclose, divulge, make known, permit the disclosure of, release, disseminate, transfer, or otherwise communicate, whether orally or by any other means, any of the terms, covenants and conditions set forth in this Agreement to any other Sales Representative, agent or representative of MMR, excepting only MMR's, Principals. Contractor acknowledges that MMR has been induced to enter into and execute this Agreement in reliance upon the terms, covenants and conditions set forth herein and that same constitutes a material term of this Agreement.

10.7    Injunctive Relief: Other Remedies.    As any violation by Contractor of the covenants, restrictions and provisions contained in this Article may cause irreparable injury to MMR and the remedy at law for any such violation(s) by Contractor will, therefore, be inadequate, Contractor agrees that MMR shall have the right, in addition to any other remedies available at law or in equity, to injunctive relief against Contractor and any such other appropriate party in a court of equity by reason of any violation of the covenants, restrictions and provisions contained in this Article.    No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity, by statute or otherwise.

10.8    Contractor may handle and sell products not in competition with MMR upon prior written notice to MMR and the execution by the parties of a mutual agreement on the products determined not in competition with MMR.

### Article XI.    Definitions.

The following terms used in this Agreement shall have the meanings set forth below:

"Affiliate" means any person, firm, corporation, partnership or association controlling, controlled by or under common control with another person, firm, corporation, partnership or association.    By way of illustration and not in limitation thereof, the term "affiliate" when applied

12

OP 3027255.4

DEFENDANT 000191



to Contractor includes all employees, agents, independent contractors, officers, members, and directors of Contractor, and all corporations, limited liability companies, partnerships and other business organizations owned by or in which Contractor's Manager (if there is one) has an ownership interest.

"Agreement" means this Agreement, including all Schedules and Exhibits attached or referred to herein.

"Business" means the business of MMR in selling, promoting and distributing MMR Products.

"Consent" means any consent, approval or authorization of, notice to, or designation, registration, declaration or filing with, any Person.

"Contract" means any contract, sub-contract, agreement, lease, license, commitment, sale and purchase order, note, loan agreement or any other arrangement or understanding of any kind, whether written or oral, and whether express or implied, whether such contract is with a Governmental Authority, an insurance provider or any other Person.

"Contractor" refers to the sales representative (whether a business entity or an individual) who or which agrees to and is appointed under this Agreement to act as MMR's Sales Representative. Whenever the sales representative is a business entity, the term "Contractor" refers both to the Contractor which is a business entity and to the Manager who is appointed for the business entity pursuant to his Agreement. In all instances, the entity Contractor and the Manager are jointly and severally liable under this Agreement.

"Competing Business" refers to any business that is the same as or similar to MMR's business or that is engaged in distributing, selling and providing products and services that are the same as or similar to the products and services distributed, sold and provided by MMR.

The terms "customer" and "client" are used interchangeably, and both terms mean all customers of MMR, including, without limiting the scope of these terms whatsoever, all customers which use or buy products from MMR as of the Effective Date of this Agreement, all of Contractor's customers who are solicited by Contractor for and on behalf of MMR during the term of this Agreement, all of Contractor's customers who are acquired, transferred or transitioned from Contractor to MMR during the Term or as a result of this Agreement, and all customers and clients acquired after the date of this Agreement who or which use or buy products from MMR.

"Effective Date" means the date set by the parties when this Agreement becomes effective.

"Governmental Authority" means any agency, authority or department of any government, whether domestic or foreign, with regulatory authority in connection with any activity or business of MMR.

"Manager" means the individual owner of the entity Contractor who is appointed to the position of Manager of the entity Contractor under this Agreement. Manager and Contractor are jointly and severally liable under this Agreement.

13

OP 3027255.4

DEFENDANT 000192



"Material" means that which is considered material for purposes of this Agreement shall be determined in light of the facts and circumstances of the matter in question. No particular monetary amount cited in this Agreement shall be deemed to determine materiality.

"MMR Principal" refers to John Tarantino, unless Contractor is notified of a change.

"MMR Products" means medical and surgical instruments and devices in the field of arthroscopy, powered surgical instruments and sports tissue and biologics distributed and sold by MMR, and to MMR's other business as an authorized distributor under other distributor and license agreements for surgical, sports medicine, rehabilitation, orthopedic and other medical products, appliances, devices and supplies to medical health care providers, clinics, hospitals and the medical trade and healthcare market generally in the States of Missouri, Kansas, Oklahoma, Nebraska, Iowa and Illinois, and certain designated geographical areas in the United States.

"Non-Compete Territory" consists of the following: (i) the entire Territory described in **Schedule 3.2**, (ii) the States of Missouri, Kansas, Oklahoma, Nebraska, Iowa and southern Illinois south of Interstate 80, (iii) any other geographical area within which MMR shall be operating, distributing and selling MMR products for its vendors/suppliers at any time during the term of this Agreement.

"Product" or "Products" when capitalized means the MMR products Contractor is authorized to market and sell under this Agreement. When used in this Agreement without capitalization the terms "product" or "products" mean all of the MMR products which MMR offers or sells to its customers and clients, including the Products assigned to Contractor. Whenever Contractor is authorized to market and sell all MMR products, then the terms "product" and "products" (whether or not capitalized) as used in this Agreement refer to all MMR products.

"Schedules" means those schedules that are referred to throughout this Agreement.

"Contractor Knowledge" means the actual knowledge of Contractor of facts sufficient that should have reasonably caused Contractor to have knowledge of a fact or circumstance.

"Tax" or "taxes" means all taxes, assessments, charges, duties, fees, levies, imposts or other governmental charges, including all federal, state, local, foreign and other income, environmental, add-on, minimum, franchise, profits, capital gains, capital stock, capital structure, transfer, sales, gross receipt, use, ad valorem, service, service use, lease, recording, customs, occupation, property, excise, gift, severance, windfall profits, premium, stamp, license, payroll, social security, employment, unemployment, disability, value-added, withholding and other taxes, assessments, charges, duties, fees, levies, imposts or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a return) and all estimated taxes, deficiency assessments, additions to tax, additional amounts imposed by any Governmental Authority, penalties, fines and interest, and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person, regardless of whether disputed.

14

OP 3027255.4

DEFENDANT 000193



"Tax return" means any return, report, declaration, information return, filing or other document (including any amendments thereto or related or supporting information) filed or required to be filed with respect to Taxes.

"Third Party Payor" means any insurance company or other Person (including any third party administrator who serves a role of acting as an intermediary between such insurance company or other Person and a Person who submits a claim for reimbursement) who provides reimbursement of expenses associated with claims filed under a health insurance or other similar health care policy or Contract.

### Article XII.    Miscellaneous.

12.1    Voluntary Agreement.    Each of the parties hereto have freely, knowingly, voluntarily and without any undue influence, coercion, fraud or duress, or in reliance upon any promise not contained herein made by other party regardless of whether same was intended to be performed, executed this Agreement after fully reading and understanding same.

12.2    MMR's Principal/President.    For the purpose of this Agreement and until notification by MMR to the Contractor to the contrary, as used herein the term "MMR's Principal" or President shall mean John Tarantino.

12.3.    Notice.    All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have duly been given if delivered or if mailed, by United States certified or registered, mail, return receipt requested, prepaid to the parties or their assignees at the following addresses (or at such other addresses as shall be given in writing by the parties to one another):

MMR:

Midwest Medical Resources, Inc.
7227 Metcalf Avenue
Overland Park, Kansas 66204
Email: *johntarantino@mwmedical.net*

Contractor:

Schmidt Medical, Inc.
20719 Pebble Lane
Lenexa, Kansas 66220

Manager:

Bob Schmidt
20719 Pebble Lane
Lenexa, Kansas 66220

12.4    Choice of Law.    The terms of this Agreement were negotiated in the State of Missouri. This Agreement has been entered into, accepted and executed by MMR in the State of Missouri. Accordingly, the laws of the State of Missouri shall govern the validity, construction, interpretation and legal effect of this Agreement and the rights, duties and obligations of the parties

15

OP 3027255.4

DEFENDANT 000194

COPY

hereunder.

12.5    Severability.    Any provision of this Agreement which is prohibited, invalid, illegal or unenforceable, in whole or part, in any jurisdiction shall be severed from, and shall not invalidate, the remaining provisions of this Agreement, and any partially which shall remain in full force and effect to the fullest extent permitted by applicable law.    To the extent permitted by law, a determination that a provision of this Agreement is prohibited, invalid, illegal or unenforceable in a jurisdiction shall not invalidate or render such provision unenforceable or invalid in any other jurisdictions in which the parties operate.    The provisions of this paragraph are in addition to and not a replacement of or restriction on the severability clause in Article X.

12.6    Waiver.    If a party hereto waives any term or condition of this Agreement or any breach thereof by the other party, such wavier will not operate or be constructed as a later or ongoing waiver of the enforcement of any such term or condition of any repetition of such breach or default hereunder.    No failure of MMR to exercise any power given it hereunder or to insist upon strict compliance by the Contractor and Manager with any obligation hereunder, and no custom or practice at variance with the terms hereof, shall constitute a waiver of the right of MMR to demand strict compliance with the terms hereof.    No waiver or modification of any of the provision of this Agreement shall be valid unless in writing and signed by or on behalf of the party granting such waiver of modification.

12.7    Warranty.    Contractor and Manager jointly and severally represent and warrant to MMR and its manufacturers/vendors, that (a) the execution, delivery and performance of this Agreement does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Contractor or Manager is a party to or by which Contractor or Manager is bound, and (b) neither Contractor nor Manager is a party to or bound by any employment agreement, non-compete agreement, confidentiality agreement or other agreement with any other persons or entity.

12.8    Assignment.    Neither Contractor nor Manager shall assign, transfer or delegate any of the rights and obligations created hereunder.    This agreement is personal, unique and distinct to Contractor and MMR shall have no obligation to recognize any purported assignee, transferee or delegate of Contractor and Manager's rights and obligations hereunder.    MMR's rights and obligations under this Agreement will inure to the benefit of and be binding upon MMR's successors and assigns.

12.9    Entire Agreement.    This instrument, together with any exhibits, appendices and riders attached hereto, constitute the entire agreement and between MMR and the Contractor with respect to the appointment of the Contractor by MMR as an independent contractor, and supersedes all previous agreements between the parties hereto, written or oral, express or implied, covering the subject matter hereof, including, without limitation, all prior agreements of any kind or description.    No representations, inducements, promises or agreements oral or otherwise, not embodied herein shall be of any force or effect.    This Agreement cannot be amended or otherwise altered except by a written instrument signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.    Oral modifications of this Agreement will have no effect and, unless reduced to writing signed by both parties hereto, be considered unenforceable.

16

OP 3027255.4

DEFENDANT 000195



12.10  Captions. The heading in this Agreement are for reference only and shall not limit or define the meaning of any terms or provision of this Agreement.

12.11  Survival. Without intending to limit any other term or provision contained in this Agreement, the terms, conditions and provisions contained in Articles VII, VIII, IX, X and XI, of this Agreement shall expressly survive the termination of this Agreement and remain enforceable according to their terms.

12.12  Rider. Any addenda or riders to this Agreement, if there be any, are hereby made a part hereof; provided, however, if any provision of any addendum or rider to this Agreement shall conflict with any of the foregoing provisions of this Agreement, the provision of the addendum or rider shall control.

12.13  Counterpart Executions. This agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

12.14  Special Acknowledgement. Contractor and MMR acknowledge that Manager is subject to certain restrictive covenants as set forth in Section 10 of that certain Independent Contractor Agreement dated January 1, 2016 by and between Manager and Raridon & Associates Orthopedics, Inc. (the "Raridon Agreement"). These restrictive covenants in the Raridon Agreement include, but are not limited to, non-competition, non-solicitation, and confidentiality restrictions (collectively, the "Restrictive Covenants"). Contractor and MMR each hereby agree that the scope and terms of Contractor's duties hereunder are intended to avoid any intentional or inadvertent violation of the Restrictive Covenants applicable to Manager or Contractor. However, notwithstanding the forgoing, Contractor acknowledges that Manager, and not MMR, has the sole obligation to strictly comply with the Restrictive Covenants. Contractor shall therefore immediately notify MMR if Contractor believes that any duty, obligation, or action required or permitted of Contractor or Manager pursuant to this Agreement would be prohibited by the Restrictive Covenants. In such an event, neither Contractor nor Manager shall perform such duty, obligation, or action.

17

OP 3027255.4

DEFENDANT 000196



IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective for all intents and purposes as of the Effective Date.

"MMR"

MMR MEDICAL RESOURCES, INC.

By:_____

"CONTRACTOR"

SCHMIDT MEDICAL, INC.

By:_____

Address:

20719 Pebble Lane
Lenexa, Kansas 662200

and

_____
Bob Schmidt; Manager

18

OP 3027255.4

DEFENDANT 000197



## Schedule 3.0
## Compensation

o   **Commencement Bonus:** A commencement bonus of One Hundred Thousand Dollars and NO/100 ($100,000.00) shall be paid to Contractor in two (2) equal installments of Fifty Thousand Dollars and NO/100 ($50,000.00) each. The first such installment shall be paid to Contractor on July 30, 2021 and the second installment shall be paid to Contractor on September 30, 2021.

o   **DJO Surgical**
  - Sales of cement will have a flat commission rate of 10%
  - Year 1 (July 1, 2021 – June 30, 2022): 20% of net monthly sales for new business and 12.5% of net monthly sales for existing business in defined territory.
  - Year 2 (July 1, 2022 – June 30, 2023): 20% of net monthly sales for new business and 12.5% of net monthly sales for existing business in defined territory.
  - Year 3 (July 1, 2023 – June 30, 2024): 12.5% of net monthly commissions for the defined territory

o   Sales commissions are paid on the last business day of the next month after monthly sales numbers are verified and paid to Midwest Medical by DJO. (i.e. January sales paid last weekday of February).

o   **Anika**
  - Year 1 (July 1, 2021 – June 30, 2022): 12.5% of net monthly sales in your defined territory
  - Year 2 (July 1, 2022 – June 30, 2023): 12.5% of net monthly sales in your defined territory
  - Year 3 (July 1, 2023 – June 30, 2024): 12.5% of net monthly commissions for the defined territory

o   Sales commissions are paid on the last business day sixty days after monthly sales numbers are verified and paid to Midwest Medical by Anika. (i.e. January sales paid last weekday of March).

o   **DJO Surgical Support Representative:** A dedicated support representative will be provided with an annual salary of $75,000.00. This will be invoiced on the 5th day of each month following the pay period directly to Contractor and payable upon receipt.

19

OP 3027255.4

DEFENDANT 000198



**Schedule 3.1**
**Products**

This **Schedule 3.1** will define specific arrangements between MMR and Sales Representative in the areas of Sales Representative's Products and Other Permitted Activities.

Name of Sales Representative: Schmidt Medical, Inc.

**Products:**

DJO Surgical, Anika

I.  Other Permitted Activities: **N/A**

C.  **Amendments.**      The provisions in this **Schedule 3.1**, including the Sales Representative's compensation, may be modified by any of the following methods: (a) Written notice from MMR to Sales Representative at any time; (a) an amended **Schedule 3.1** or (c) a letter executed subsequent to the date of the Sales Representative's Offer of Employment Letter, if there is one, and otherwise a letter subsequent to the date of this **Schedule 3.1**. To be effective, the modification by an amended **Schedule 3.1** only must be in writing, dated, contain all changes agreed to by the parties and executed, signed by both the Sales Representative and MMR and attached to the Sales Representative's Agreement. Changes made by MMR by written notice or subsequent letter need not be signed by Sales Representative. No other representative or agent of MMR other than a Principal can authorize or sign this **Schedule 3.1**, any amended **Schedule 3.1** or any letter or notice modifying this or any subsequently dated **Schedule 3.1**.

20

OP 3027255.4

DEFENDANT 000199



COPY

## Schedule 3.2
## Territory

This **Schedule 3.2** will define Sales Representative's Territory.

**Sales Representative's Territory:**

The following nonexclusive accounts and nonexclusive Sales Representative Territory:

(a) Accounts in Sales Representative's Territory (*list physicians, clinics, hospitals, other entities*) to become effective July 2, 2022:
 a. Stormont Vail Hospital, Topeka, KS
  i. Dr. Mumford
  ii. Dr. Smith
  iii. Dr. Tilley
  iv. Dr. Wallace
  v. Dr. McCoy
  vi. Dr. Wilson
  vii. Dr. Poole
  viii. Dr. Steeby
  ix. Dr. Whale
  x. Dr. Stumpf
  xi. Dr. Deister
 b. Lawrence Memorial Hospital, Lawrence Memorial Hospital (West Campus)
  i. Dr. Pro
  ii. Dr. Stull
  iii. Dr. Lintecum
  iv. Dr. Wendt
  v. Dr. Huston
  vi. Dr. Galligan
  vii. Dr. Goodyear

(b) Accounts in Sales Representative's Territory Paid at A Reduced Rate (*list physicians, clinics, hospitals, other entities*) to become effective July 2, 2022:
  i. Dr. Steeby
  ii. Dr. Tilley

---

(c) Sales Representative's Territory to become effective July 2, 2022 (*geographical territory*):
 a. Lawrence, KS
 b. Topeka, KS
 c. Mutually agreed upon Kansas City, MO accounts/physicians (TBD)

The accounts and geographical area (Sales Representative's Territory) identified above are **nonexclusive** and may be serviced by other Sales Representatives, employees and independent contractors of Midwest Medical Resources, Inc. (MMR) as determined by MMR from time-to-

21

OP 3027255.4

DEFENDANT 000200

Exhibit 2, Page 21 of 22



time.

**Amendments.**        The provisions in this **Schedule 3.2,** including the Sales Representative's compensation, may be modified by any of the following methods: (a) Written notice from MMR to Sales Representative at any time; (a) an amended **Schedule 3.2** or (c) a letter executed subsequent to the date of the Sales Representative's Offer of Employment Letter, if there is one, and otherwise a letter subsequent to the date of this **Schedule 3.2.** To be effective, the modification by an amended **Schedule 3.2 only** must be in writing, dated, contain all changes agreed to by the parties and executed, signed by both the Sales Representative and MMR and attached to the Sales Representative's Agreement. Changes made by MMR by written notice or subsequent letter need not be signed by Sales Representative. No other representative or agent of MMR other than a Principal can authorize or sign this **Schedule 3.2,** any amended **Schedule 3.2** or any letter or notice modifying this or any subsequently dated **Schedule 3.2.**

22

OP 3027255.4

DEFENDANT 000201