IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RARIDON & ASSOCIATES ORTHOPEDICS,
INC.,

        Plaintiff,

        v.

ROBERT SCHMIDT and MIDWEST
MEDICAL RESOURCES, INC.,

        Defendants.

Case No. 2:23-CV-2373-JAR

## MEMORANDUM AND ORDER

Plaintiff Raridon & Associates Orthopedics, Inc. ("Raridon") originally filed this diversity action against Defendants Robert Schmidt and Midwest Medical Resources, Inc. ("MMR") in the United States District Court for the Southern District of Iowa.  The case was transferred to this District on August 29, 2023,[1] and this Court dismissed MMR on December 28, 2023.[2]  Now before the Court are Plaintiff's Motion for Summary Judgment (Doc. 135)[3] on its remaining two claims against Schmidt and Schmidt's pro se Motion to Dismiss (Doc. 143). These motions are fully briefed, and the Court is prepared to rule.[4]  For the reasons stated below,

---

[1] Doc. 107.

[2] Doc. 128.

[3] Plaintiff's request for oral argument is denied, as the Court does not find it would materially assist the Court in deciding this motion.

[4] The parties' motions were filed in 2024.  Plaintiff timely responded to Defendant's pro se motion to dismiss, but Defendant did not file a reply.  Defendant did not respond to Plaintiff's summary judgment motion.  On July 31, 2024, the Court issued a supplemental briefing order, directing Plaintiff to address the performance element of its breach-of-contract claim by August 6, 2024.  Doc. 147.  Defendant was given an opportunity to respond with his own supplemental brief by August 13, 2024.  Plaintiff timely filed its supplemental brief, *see* Doc. 148, but Defendant did not respond.  Instead, on August 13, 2024, Defendant filed a Notice of Filing of Bankruptcy, and the case entered a bankruptcy stay.  *See* Docs. 151, 153.  On July 15, 2025, the Court lifted the bankruptcy stay and gave Defendant until July 22, 2025, to file a supplemental response brief as directed in the Court's July 31, 2024 Order.  The Court further advised that the motion for summary judgment would be considered under advisement on July 23, 2025.  Defendant did not file a response and this motion is now ripe for ruling.

the Court grants in part Plaintiff's motion for summary judgment on the breach-of-contract claim in Count I.  The Court denies Defendant's motion to dismiss.

## I.    Plaintiff's Motion for Summary Judgment

### A.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[5]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[6]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[7]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[9]

To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[10]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[11]

---

[5] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[6] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[7] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[8] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).

[9] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[10] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[11] *Anderson*, 477 U.S. at 256.

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

In deciding this motion, the Court is mindful that Defendant proceeds pro se; therefore, the Court must construe his pleadings liberally.[13]  However, the Court cannot assume the role of advocate,[14] or "construct a legal theory" on Defendant's behalf.[15]  Additionally, a pro se litigant is not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[16]

### B.    Uncontroverted Facts

Defendant has not responded to the motion for summary judgment.  Although courts may not simply grant motions for summary judgment as uncontested,[17] under Fed. R. Civ. P. 56(e), the Court has several options where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)."  The Court may deem a fact undisputed,[18] and the Court may grant summary judgment "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."[19]  Under Rule 56(e)(2), the Court will deem undisputed the facts presented in Plaintiff's summary judgment brief to the extent they are supported by the record.  With this in

---

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[13] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[14] *Id.*

[15] *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

[16] *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

[17] *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

[18] Fed. R. Civ. P. 56(e)(2).

[19] Fed. R. Civ. P. 56(e)(3).

mind, the Court finds that the following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff sells and distributes orthopedic implants to hospitals and physicians across Iowa, Missouri, Nebraska, Kansas, and parts of Illinois. Plaintiff sells DePuy Synthes ("DePuy") brand products. Scott Raridon, Jr. ("Scott") and Chad Sievers are Plaintiff's co-owners. Plaintiff is a successor business to Scott's father's business, Raridon & Associates, Inc., which was dissolved on January 1, 2016.

Defendant worked at Scott's father's business and Plaintiff's business successively. On January 1, 2016, when Raridon & Associates, Inc. was dissolved, Defendant entered into an Independent Contractor Agreement ("the Agreement") with Plaintiff. Defendant agreed to market and sell Plaintiff's orthopedic products in exchange for compensation. The Agreement states, in relevant part:

> **1. Services.** Company hereby appoints Contractor to sell the products listed on Exhibit 1 (the "Products") to certain accounts and within the Territories listed on Exhibit 1, attached hereto and incorporated by this reference, during the term of this Agreement. While this Agreement is in effect and Contractor is not in default hereof, Contractor shall be permitted to sell Products to the assigned accounts and within the assigned territories. Contractor agrees to use Contractor's best efforts to sell the Products to develop the assigned territories and accounts to their fullest potential, agrees to keep Company informed of Contractor's activities and sales on behalf of Company, agrees to attend all training and educational programs required by the Company and its Vendors and Affiliates and agrees to attend all meetings as requested by the Company.[20]

Paragraph 10 of the Agreement includes several restrictive covenants, including:

> **(c. Protection of Company's Goodwill**. Contractor agrees that for a period of one (1) year after the termination of this Agreement, Contractor will not, directly or indirectly, on

---

[20] Doc. 136-9 ¶ 1.

Contractor's own behalf or in association with or through any other individual or entity, engage in Competitive Activities in the Territory or the solicitation of Company customers or accounts with whom Contractor had personal contact during the term of this Agreement. For purposes of this Section 10(c) only, Competitive Products and/or Competitive Activities shall include only products and/or services which were sold or provided by the Company at the time of such termination and shall not include any other products or services sold or provided by any other J&J company. For purposes of this Section 10(c) only, Company customers include customers having done business with the Company during the one (1) year prior to termination of Contractor's relationship.

. . . .

**(f) <u>No Sales of Competitive Products</u>.** Contractor agrees that commencing on the Effective Date of this Agreement and continuing until its termination, Contractor will devote Contractor's best efforts and sufficient working time to selling the Products Identified on Exhibit 1 attached hereto, and shall not engage in the sale of Competitive Products (as defined herein) or in Competitive Activities (as defined herein) without obtaining prior written consent from the Company. If Contractor is involved in the sale of Competitive Products or in Competitive Activities on the Effective Date of this Agreement, then Contractor agrees to cease such sales and activities immediately or as soon as contractually permissible and shall advise the Company President accordingly. Neither Contractor nor any member of Contractor's immediate household will receive compensation for the sale of Competitive Products or Competitive Activities.

Contractor agrees that no claim that Contractor has against the Company shall constitute a defense to enforcement of this Section.[21]

For almost two decades, under both Raridon entities, Defendant's sales territory included Stormont Vail Hospital ("Stormont Vail") in Topeka, Kansas. Defendant's job was to manage and facilitate the orthopedic needs of surgeons on behalf of their patients. During the time Defendant worked for Raridon, he sold DePuy implants. At Stormont Vail, Defendant was the

---

[21] *Id.* ¶ 10(c), (f).

lead local representative for Plaintiff.  Defendant worked with Elijah Jimerson, a sub-representative and contractor with Plaintiff.  Jimerson had less experience than Defendant and reported to Defendant.  Defendant reported to Plaintiff's Sales Director David Jandric, who reported to Scott and Sievers.

In 2021, Defendant's client, Dr. Joseph Dr. Mumford was the largest purchaser of DePuy orthopedic implants at Stormont Vail.  Dr. Mumford used DePuy products continuously for 28 or 29 years in his surgical practice.  Defendant and Dr. Mumford are friends.

### *Pricing Initiative/Negotiations*

On February 12, 2021, Stormont Vail announced a plan to implement a pricing initiative that would require vendors to meet its pricing for hip and knee implants by March 2021.  Dr. William Sachs and Angela Gamber were in charge of the pricing initiative at Stormont Vail. Jandric represented Plaintiff in these negotiations, and he maintained communication with Defendant about the negotiation process.

Plaintiff did not come to terms with Stormont Vail in March 2021, but the parties continued to negotiate.  Defendant and Dr. Mumford were both concerned about the failure to reach an agreement on DePuy products, as evidenced by their text messages about the ongoing negotiations.  Dr. Mumford was concerned that he might not be able to use DePuy implants in his practice if Plaintiff did not meet the pricing goals, and Defendant was concerned because Dr. Mumford was his largest client and represented the majority of his income.  In early March 2021, Defendant messaged Dr. Mumford that "[i]t's not [Raridon's] decision [if they can meet the pricing requirements] . . . that is why I'm shitting my pants.  If this goes down . . . . I hope you will still support me in a company switch."[22]

---

[22] Doc. 136-10 at 6.

On April 1, 2021, Dr. Sachs emailed the orthopedic group at Stormont Vail regarding the pricing initiative, stating, in part:

> As most of you are aware, the main outlier at this time is DePuy – we have not yet been able to reach the target pricing for either hips or knees. We have had several conversations with Raridon as well as Johnson and Johnson, but we are still not at the price point of $3,200 for a knee and $3,800 for a hip. We are hopeful that we will come to the pricing agreement by June 1st.[23]

Plaintiff and Stormont Vail did not reach an agreement by June 1, 2021, but continued negotiating. Jandric updated Defendant about the negotiations on June 14, 2021, via text message, and asked, "[c]urious to hear what [Dr. Mumford] has been told, u gonna be with him tmrw?"[24] Defendant responded that he would be with Dr. Mumford the next day.

On June 16, 2021, at 9:30 a.m., Sievers and Jandric participated in a meeting with DePuy's manufacturer (Johnson & Johnson) titled "Stormont Vail [Contract Pricing Committee] Alignment." At that meeting, Sievers and Jandric obtained a verbal commitment from Johnson & Johnson that it would meet Stormont Vail's pricing demand. The next day, on June 17, 2021, the Contract Pricing Committee ("CPC") approved the pricing without further stipulations. These terms were not reduced to a formal agreement until the end of July, but Jandric considered the deal complete on June 17, 2021. That same day, Jandric texted Defendant, "[t]ried to call earlier, initial feedback from CPC is positive for us. Good news."[25] Defendant responded with a "thumb's up" sign, and Jandric replied, "that's it? Thumb's up?"[26] Defendant replied, "I will do a backflip . . . when it's signed."[27]

---

[23] Doc. 136-22 at 1.

[24] Doc. 136-23 at 59.

[25] Doc. 136-23 at 61.

[26] *Id.*

[27] *Id.*

The next day, on June 18, Jandric messaged Dr. Sachs and said, "[j]ust wanted you to know that it looks like we received approval.  I will be forwarding the agreement as soon as I have it, should be no later than mid next week."[28]  Dr. Sachs replied, "[t]hat's fantastic news. Thank you for working hard on getting that moved forward."[29]  On Monday, June 21, Defendant texted Jandric, "[d]o you still have CPC meeting tomorrow?"[30]  Jandric replied, "CPC was last week, it's done, waiting for paper."[31]  Defendant replied, "[i]t's approved?"  Jandric responded, "[y]a, that's what I was telling you last week."[32]  Defendant stated, "[y]ou said feedback was positive . . . not that it was approved.  So now just need paperwork . . . ."[33]  Jandric responded, saying "[c]orrect."[34]  Jandric testified that he considered the deal "done" at that point, and it was "just a matter of formality getting things signed."[35]

Defendant testified that he did not recall whether he told Dr. Mumford about the fact that Plaintiff and Stormont Vail came to terms on pricing in June, either on the 17th when Jandric told him feedback was positive or on the 21st when Jandric communicated the deal was approved. Dr. Mumford testified that he was not told about the agreement until June 29, 2021, when Sachs and Gamber told him.

---

[28] Doc. 136-21.

[29] *Id.*

[30] Doc. 136-23 at 61.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] Doc. 136-2 at 100:24–101:04.

### *Search for Different Implants*

Dr. Mumford was under no obligation to use a particular brand of implants, and he testified that Stormont Vail told him to "move on" from DePuy products due to the length of the ongoing negotiations.[36] Dr. Mumford testified that he held out as long as he could, but that he thought Plaintiff would never meet Stormont Vail's pricing demand. Dr. Mumford told Defendant about the "move on" comment on June 8 or 9, 2021, but Defendant did not tell Jandric, Sievers, or Scott that Dr. Mumford had been told to "move on" to different implant providers by Stormont Vail. Defendant "was very concerned. . . . I began trying to find a way to salvage my livelihood."[37]

DonJoy Orthopedics ("DJO") is a competing brand of knee and hip implants sold by Midwest Medical Resources, Inc. ("MMR"). On June 9, 2021, Defendant messaged Dr. Mumford saying, "[w]ould you consider DonJoy? They have some really cool technology coming down the pipeline."[38] Defendant and Dr. Mumford then spoke on the phone for 12 minutes. After this phone call, Defendant called MMR's CEO John Tarantino and spoke for 28 minutes. Defendant and Tarantino had five additional calls that day. During these phone calls with Tarantino, Defendant conveyed that Dr. Mumford wanted exposure to DJO products and to potentially look at them in a lab setting.

On June 11, 2021, MMR offered Defendant a 1099 Independent Contractor position, which included a $100,000.00 signing bonus. Three days later, on June 14, Defendant met with Tarantino at MMR's office to talk about the offer to work with MMR. From June 9 to June 14, Defendant and Tarantino discussed his job offer and Dr. Mumford using DJO products. Later in

---

[36] *See* Doc. 136-4 at 26:5–13.

[37] Doc. 136-5 at 38:5–9.

[38] Doc. 136-10 at 26.

the day on June 14, Defendant messaged Dr. Mumford, "I had a great meeting today with Midwest Medical (DonJoy).  They have a ton to offer and are very, very nimble.  We can talk more tomorrow.  Thank you."[39]  Dr. Mumford asked Defendant if he talked to "George," meaning George Mordica, who works for MMR.  The two made plans to meet for a beer the next day.  Defendant also asked Dr. Mumford about his schedule so that Dr. Mumford could attend a DJO cadaver lab to see DJO products.  The purpose of a cadaver lab is to educate surgeons on how to use certain products and allow surgeons to use the products themselves.

In response to Defendant's texts about DonJoy implants, Dr. Mumford texted "[k]eep in mind I want to emulate my current workflow: navigation, tibia first, tensometer and dial in the femur.  No interest in old school."[40]  Defendant testified that he understood this text to mean that Dr. Mumford needed to emulate the workflow he had with DePuy implants.  On June 15, 2021, Defendant had 15 separate calls with Tarantino between 7:00 a.m. and 6:00 p.m.  Defendant testified that he discussed the DJO cadaver lab with Tarantino during those calls.  On June 15, 2021, Defendant and Dr. Mumford met for dinner and beers at a restaurant, Iron Rail.  Defendant recalls talking about the DePuy contract negotiations, their kids, and the DJO cadaver lab at that dinner.  Defendant recalls Dr. Mumford telling him that the "ship has sailed" on DePuy.[41]  Dr. Mumford does not recall discussing any information about the deal with DePuy going forward, and he thought the deal would never happen at that point.  After dinner, Defendant called Tarantino three times to update him on the discussion with Dr. Mumford.

On June 16, 2021, Defendant messaged Dr. Mumford,

> DePuy is pushing me hard.  I think they finally see the writing on
> the wall.  I am getting my contract from Tarantino tomorrow.  Am

---

[39] *Id.* at 28.

[40] Doc. 136-12 at 7.

[41] Doc. 136-5 at 116:3–4.

I okay to move forward prior to next Wednesday?  I want to be 100 percent positive we are on the same page.  Thank you . . . I haven't slept this well in months!![42]

Dr. Mumford replied, "[i]f I can keep navigating with the same stuff I'm using now and use DonJoy implants, then go for it."[43]  Defendant "loved" the message from Dr. Mumford, and then added, "[b]ased on our discussions yesterday . . . [at Iron Rail], I don't have any reason to believe we can't."[44]  Defendant meant that Dr. Mumford could keep "navigating with the same stuff" he was using with DePuy but with DJO implants.[45]  Defendant did independent research on DJO products to answer this question for Dr. Mumford in the affirmative.

On June 17, 2021, Defendant texted Dr. Mumford to ask if he needed a surgeon to act as a liaison or resource at the DJO cadaver lab.  Dr. Mumford declined.  Defendant also messaged Dr. Mumford about transportation to the DJO lab.  On June 23, 2021, Dr. Mumford went to Kansas City for the DJO cadaver lab.  MMR hired a driver to bring Dr. Mumford to MMR's office in Kansas City, where Defendant was waiting for him.  Defendant then drove Dr. Mumford to the lab location.  Defendant testified that he did not go into the lab because that would have been out of line under his Agreement with Plaintiff.  Defendant waited at the MMR office for several hours while Dr. Mumford was at the DJO lab.

After the lab was done, Defendant drove back to the lab's location, picked up Dr. Mumford, and drove him to a steakhouse for dinner.  About five others were present, all from

---

[42] Doc. 136-12 at 7–8.

[43] *Id.* at 8.

[44] *Id.*

[45] Doc. 136-5 at 122:20–123:2.  By "navigation system," Dr. Mumford meant "Brain Lab," which is a computer system used in surgeries.  Brain Lab is set to be used with an Attune prosthetic knee, which is a DePuy implant.  There is no way to select another implant to use with the Brain Lab navigation system.  Defendant would have needed to know how the femur of the DJO implant compared in size to the DePuy product shown on-screen within the Brain Lab system to tell Dr. Mumford that he could use Brain Lab with DJO products.

MMR, including Tarantino.  Defendant testified that the dinner was "just meeting the people around the table."[46]  After dinner, Defendant texted Dr. Mumford,

> [t]hank you for a great day.  I am more excited now that I have been in a long time.  Your toast regarding silver linings was 100 percent spot-on.  I will communicate w Elena to determine the best case next week for a kickoff campaign.  I love you & thank you Sir Jose![47]

The next day, Dr. Mumford texted Defendant, stating that he "look[ed] forward to working with this new team.  Thanks, bro."[48]

On June 24, 2021, Defendant talked with Elena Watt, Dr. Mumford's P.A., about which cases were best to trial DJO products at Stormont Vail.  Defendant then messaged Dr. Mumford about his surgery schedule to help him select which surgery to start trialing DJO implants.  Defendant texted "[y]ou have three primary knees on Tuesday—2nd, 3rd & 4th cases.  Do you want to try one of those?"[49]  Defendant messaged Watt about the Tuesday and Wednesday primary knee cases, stating, "[w]ould you be so kind as to assist me in identifying which one of these cases we can schedule a trial run?  I told Dr I would work w you to identify . . . . Thank you."[50]  Defendant testified that, looking back, he "shouldn't have selected cases or suggested cases" because "[i]t goes against the noncompete."[51]  Defendant also texted Watt that "all hips are available, as well.  I will wait for your lead.  Already on shelf & contract . . . FYI.  Not trying to be pushy."[52]

---

[46] *Id.* 134:11–12.

[47] Doc. 136-12 at 14.

[48] *Id.* at 15.

[49] *Id.*

[50] Doc. 136-30.

[51] Doc. 136-5 at 156:20–23.

[52] Doc. 136-30.  In Plaintiff's statement of facts, ¶¶ 116, 117, and 119 refer to alleged texts between Defendant and Watt about hips, but these texts do not appear in the cited material.  Only Defendant's first text to

Also on June 24, 2021, an email was sent to Stormont Vail personnel, copying

Defendant, stating:

> Beginning Tuesday, June 29th Dr. Mumford will be trialing total
> knees with DJO.  Dr. Mumford plans to still utilize DePuy
> computer navigation while implanting DJO products at this time
> . . . . As far as the pans and instruments go, there will be reps from
> both DJO and DePuy present to help assist with this.[53]

On June 25, 2021, Defendant left town to go to his daughter's multiday volleyball tournament in

Las Vegas.  That same day, Defendant told Jimerson that Dr. Mumford was going to trial DJO

products and asked Jimerson to help him out, which Jimerson understood to mean that Jimerson

was to assist Dr. Mumford with his trial of DJO products.

On June 28, 2021, Defendant messaged Dr. Mumford stating, "[j]ust wanted to let you

know that everything is ready to roll for tomorrow and Wednesday.  I will check in w you

tomorrow to make sure you are happy w everything.  Thank you."[54]

On June 29, 2021, Jimerson entered cancellations into Plaintiff's scheduling software

system for three knee surgeries that day that Dr. Mumford had previously scheduled using

DePuy implants because Dr. Mumford would be using DJO implants.  Jimerson was present at

the three knee surgery trials on June 29, along with two MMR representatives.  Jimerson was

there to run the Brain Lab software, which helped Dr. Mumford align the knees to accept the

DJO implants.  That morning, Jandric opened his scheduling software and saw that Dr. Mumford

had cancelled all three knee surgeries scheduled to be performed with DePuy implants.  Jandric

knew that three cancellations for a surgeon as experienced and busy as Dr. Mumford was

---

Watt, noting that hips are available, is supported by the record.  Thus, the Court disregards the facts alleged in ¶¶ 116, 117, and 119.

[53] Doc. 136-36.

[54] Doc. 136-12 at 15–16.

unusual.  Jandric called Jimerson many times.  Defendant knew about the calls and texted

Jimerson, "[n]o need to respond to [Jandric]."[55]  Defendant also texted Jimerson saying to delete

their text strand, and Jimerson responded that he did, in part.  Defendant testified that this

comment was a joke.

Defendant checked in with Jimerson via text message later that morning, asking, "[k]nee

start?"[56]  Jimerson replied about how the surgery went and that Dr. Mumford was planning to

make some adjustments for the next DJO surgeries.  That evening, Dr. Mumford texted

Defendant, asking "do you know anything about the latest DePuy contract?"[57]  Defendant

replied, "[n]o . . . I haven't heard anything.  Have you?"[58]  Dr. Mumford responded,

> [j]ust before I did my first DJO Sachs and Gamber came down to
> surgery and said they have a contract in hand which met all
> S[torment] V[ail] demands.  I don't think it's final, they have to
> run it through legal and everything.  Just thought I'd give you a
> head's up.[59]

Dr. Mumford was in his scrubs, walking into the first surgery with DJO products, when Sachs

and Gamber told him about the deal reached with Plaintiff, and that this was the first time he

learned about the deal on pricing.  On June 30, 2021, Dr. Mumford had more knee surgeries with

DJO products.  Defendant messaged him that day saying, "[p]lease give me a call at your

convenience . . . I understand today went well?"[60]  Defendant and Dr. Mumford then spoke on

the phone for 12 minutes about Dr. Mumford's day trialing DJO products.

---

[55] Doc. 136-16 at 1.

[56] Doc. 136-14 at 4.

[57] Doc. 136-12 at 16.

[58] *Id.*

[59] *Id.* at 16–17.

[60] *Id.* at 17.

Also on June 30, Jandric messaged Jimerson asking Jimerson to call him. Jimerson consulted with Defendant, who instructed him not to discuss DJO with Jandric. However, when Jimerson called Jandric, he told Jandric what he knew about Dr. Mumford's cancelled cases and use of DJO products on June 29 and 30. Jimerson testified that he did not want to be dishonest with Jandric. That day, Jandric messaged Defendant, asking "[w]hy didn't you tell me that Joe Dr. Mumford was doing DJO today?"[61] Defendant did not respond to Jandric.

Defendant entered into an Independent Contractor Agreement with MMR with an effective date of July 1, 2021. As described in the MMR Agreement, Defendant's sales territory with MMR includes Stormont Vail, but limited Defendant's capacity to sell there until July 2, 2022, in order to avoid violating his non-competition agreement with Plaintiff. Defendant received $100,000.00 as a signing bonus with MMR. That same day, Dr. Mumford gave notice of his official switch, starting July 6, to DJO products for "primary TKAs," but that "all total hip anthroplasties will be ACTIS with DePuy at this time."[62] Defendant also texted Jimerson on July 1 and asked if he had spoken to Jandric. Jimerson replied that Jandric "was also trying to understand the whole DJO thing with Dr. Mumford and was upset he was not informed about it. He said he was trying to get ahold of you yesterday. You might want to call him when you have a chance."[63] Jandric texted Defendant again that day, stating, "[o]ptics don't look good Bob. U need to call me."[64] Defendant did not return Jandric's text and did not call him.

On July 2, 2021, Jandric emailed Defendant, terminating their Agreement:

Bob,

---

[61] Doc. 136-23 at 61.

[62] Doc. 136-15 at 2.

[63] Doc. 136-16 at 3.

[64] Doc. 136-23 at 62.

> We find ourselves in the unfortunate situation of dissolving our working relationship. After working very hard for the last six months on getting a suitable agreement for Stormont across the finish line, I discovered that Joe Dr. Mumford has been using other implants at Stormont-Vail. At a time where we should be united to earn his business back, you have instead chosen to end communication with our team and leave a less experienced teammate in place to carry the load.[65]

The email advised Defendant that Plaintiff intended to terminate the Agreement effective that same day, July 2, 2021. Defendant responded via email, stating, in part, "David – just so things are clear, I have no control over Joe Dr. Mumford and could not stop his use of other products given the long delays with the J&J contract."[66]

## C.    Discussion

Plaintiff moves for summary judgment against Defendant on the two remaining claims in this matter: (1) breach of contract; and (2) civil conspiracy. Plaintiff asserts that Defendant's facilitation of Dr. Mumford's switch from DePuy products to DJO products constituted a breach of contract, and that Defendant's conversations with MMR to accomplish this change constituted civil conspiracy. Plaintiff seeks compensatory damages and attorney fees on the breach-of-contract claim, and punitive damages on the civil-conspiracy claim.

### 1.    Breach of Contract

#### a.    Choice of Law

Typically, "a federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."[67] However, when a case is transferred and the transferor court does not lack personal jurisdiction over the defendant, the

---

[65] Doc. 136-18 at 1.

[66] *Id.*

[67] *Boyd Rosen & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352–53 (10th Cir. 1997).

Court follows the choice-of-law rules of the transferor court.[68]  This case was not transferred for

lack of personal jurisdiction in the transferor court, so the Court applies Iowa's choice-of-law

principles.

The parties' Agreement specifies it "shall be governed by and construed in accordance

with" Iowa law. [69]  Iowa applies the Restatement (Second) of Conflict of Laws § 187, which

provides that the parties choice of law in a contract governs unless the chosen forum has no

"substantial relationship to the parties or the transaction and there is no other reasonable basis for

the parties' choice," or because it would be contrary to public policy.[70]  There is no evidence that

Iowa does not have a substantial relationship to the parties or transaction, or that enforcing this

choice-of-law provision runs counter to Iowa public policy.  Therefore, the Court applies Iowa

law to the contract claim.

### b.    Elements

To prove a breach of contract under Iowa law, the plaintiff must show:

> (1) the existence of a contract; (2) the terms and conditions of the
> contract; (3) that it has performed all the terms and conditions
> required under the contract; (4) the defendant's breach of the
> contract in some particular way; and (5) that plaintiff has suffered
> damages as a result of the breach.[71]

First, Plaintiff has established that a contract between the parties exists.  The parties

entered the Independent Contractor Agreement on January 10, 2016, and it governed during the

time period in question.  Second, the terms and conditions of the Agreement were clear: Schmidt

agreed to engage in the marketing and selling of Raridon's orthopedic products (which are

---

[68] *See, e.g.*, *Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202, 1211 (10th Cir. 2001).

[69] Doc. 136-9 ¶ 21(a).

[70] *See Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219, 223 (Iowa 2014) (quoting Restatement (Second) Conflict of Laws § 187(2)).

[71] *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

manufactured by DePuy) subject to the terms of the Agreement, and Raridon agreed to compensate Schmidt as described in the Agreement.  There is uncontested evidence under the third element of the claim that Plaintiff performed with all of the terms and conditions of the contract—it paid Defendant in accordance with the contract and performed its obligations thereunder.[72]

Plaintiff has also established on the fourth element of its claim that Defendant breached the Agreement in the following ways: (1) by encouraging Dr. Mumford, Plaintiff's customer, to switch from using Plaintiff's DePuy products to DJO products; (2) by leveraging his personal relationship with Dr. Mumford to identify surgical work-arounds that would allow Dr. Mumford to switch to a competitor's products; (3) by working with the competitor's CEO to ensure Plaintiff's customer had the necessary information to facilitate switching to the competing product; (4) by arranging for Dr. Mumford to attend the competitor's cadaver lab and waiting there until the lab was complete, followed by a celebratory steak dinner with the competitor's personnel to discuss their future together; (5) by personally considering Dr. Mumford's surgery schedule and selecting the best surgeries for Dr. Mumford to try out the competing products under the most ideal circumstances; (6) by engaging another Raridon contractor (Jimerson) to assist Dr. Mumford in using a competitor's products and convincing Jimerson to delete evidence of this competition and lie; and (7) by expanding the competitor's business opportunity by introducing hip implants into the transition, in addition to knees.

As documented in Plaintiff's brief in support of summary judgment, the record is also replete with evidence that Defendant breached the Agreement through concealing information from Plaintiff, including Defendant and Dr. Mumford's efforts to switch to a competitor's

---

[72] *See* Docs. 148-1, 148-2.

products in direct violation of paragraph 10(f) of the Agreement.  And, importantly, the uncontroverted facts demonstrate that Schmidt knowingly withheld from Dr. Mumford that Stormont Vail and DePuy had struck a deal in pricing, so there was in fact no need for Dr. Mumford to switch from the DePuy products that he was accustomed to working with.

Finally, on the fifth element, Plaintiff has established as a matter of law that Plaintiff suffered damages due to these many breaches.  The record shows that Defendant orchestrated Dr. Mumford's conversion to DJO implants, supplied by MMR, through his various actions and inactions.  The loss of Dr. Mumford's high-volume business clearly damaged Plaintiff.

Accordingly, no reasonable jury could find other than for Plaintiff on Count I, its breach-of-contract claim.

### c.        Damages

Plaintiff seeks compensatory damages and attorney fees.[73]  The Agreement provides that "[a]ctual, compensatory and/or punitive damages are available for breach of any term of this Agreement."[74]  And it specifically provides for damages and reasonable attorney fees if the restrictive covenants in paragraph 10 are violated.[75]  "Under Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed."[76]

Plaintiff seeks $469,359 in lost profits due to losing Dr. Mumford's business.  The Court agrees that Plaintiff's lost profits due to the loss of Dr. Mumford's business is the proper measure of damages; it should have been reasonably foreseeable to Defendant when he entered

---

[73] Doc. 142 ¶ 5.a.

[74] Doc. 136-9 ¶ 16.

[75] *Id.* ¶ 11.

[76] *Midland Mut. Life Ins. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998).

into the Agreement that such damages would follow from the breaches that occurred here.[77]
Plaintiff submits Barry Sussman's expert report to support its damages request, which is
undisputed.[78]  Sussman calculated Plaintiff's 18% lost commission for a period of three years.
This period begins when Defendant breached the Agreement and ends three years later, based on
an estimated retirement date for Dr. Mumford.  The Court finds that Plaintiff has established a
factual basis for this damages request and awards it compensatory damages in the amount of
$469,359 on the breach-of-contract claim.

Under Iowa law, attorney fees are generally only recoverable by statute or under a
contract.[79]  The Court finds that Plaintiff is entitled to an award of reasonable attorney fees under
paragraph 11 of the Agreement.  Plaintiff is directed to file an application for reasonable attorney
fees, along with supporting documentation, within 21 days of this Order.

In sum, Plaintiff has met its summary-judgment burden of showing that no reasonable
trier of fact could find other than in its favor on the contract claim.  Plaintiff's motion for
summary judgment on this claim is therefore granted.  Plaintiff is awarded compensatory
damages in the amount of $469,359 and reasonable attorney fees.

### 2.    Civil Conspiracy

Plaintiff asserts that Iowa law applies to its civil conspiracy claim, but offers no analysis
about why the choice-of-law provision in the parties' Agreement controls this tort claim given its
narrow language—the Agreement itself is governed by and construed with Iowa law.  Applying
Iowa's choice-of-law rules, it uses the "most significant relationship" doctrine to determine the

---

[77] *See Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994) ("Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.").

[78] Doc. 131-1.

[79] *Goche v. WMG, L.C.*, 970 N.W.2d 860, 863 (Iowa 2022),

applicable law for issues in tort.[80]  Based on the undisputed facts, Kansas has the most significant

contact with this litigation.  Plaintiff alleges that Defendant conspired with MMR to convert

Plaintiff's biggest customer to a competitor's product in breach of the Agreement.  The customer

was based in Kansas, and most of the conduct giving rise to the tort occurred in Kansas.  To

establish the tort of civil conspiracy under Kansas law, Plaintiff must show, "(i) two or more

persons, (ii) an object to be accomplished, (iii) a meeting of the minds in the object or course of

action, (iv) one or more unlawful overt acts, and (v) damages as the proximate result thereof."[81]

Additionally, a conspiracy claim "is not actionable without commission of some wrong giving

rise to a cause of action independent of the conspiracy."[82]

Similarly, under Iowa law, "[a] conspiracy is a combination of two or more persons by

concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some

purpose not in itself unlawful."[83]  A civil conspiracy claim is "merely an avenue for imposing

vicarious liability on a party for the wrongful conduct of another with whom the party has acted

in concert."[84]  There must be underlying wrongful conduct that is tortious, and "the wrongful

conduct taken by a co-conspirator must itself be actionable."[85]

---

[80] *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987).

[81] *Reams v. City of Frontenac*, 587 F. Supp. 3d 1082, 1104 (D. Kan. 2022) (citing *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984)).

[82] *Id.* (citing *Stoldt*, 678 P.2d at 161); *Knight v. Neodesha, Kan., Police Dep't*, 620 P.2d 837, 843 (1980) ("[T]he question of whether a cause of action has been stated depends in large part upon the underlying torts alleged against the individual defendants.);

[83] *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977)).

[84] *Id.*

[85] *Id.*; *Criterion 508 Sols., Inc. v. Lockheed Martin Servs., Inc.*, 806 F. Supp. 2d 1078, 1104 (S.D. Iowa 2009) ("If the plaintiff does not present sufficient evidence generating genuine issues of material fact for the underlying wrongful conduct, then the civil conspiracy claim also fails."); *Hirschbach Motor Lines, Inc. v. SmartTruck Undertray Sys., Inc.*, No. C17-1019-LTS, 2018 WL 283261, at *22 (N.D. Iowa Jan. 3, 2018) ("[A] claim for civil conspiracy cannot survive in the absence of an underlying tort claim.").

Although Plaintiff has prevailed on its summary-judgment motion against Defendant for breach of contract, it alleges no independent tort claim in the Pretrial Order that could give rise to a civil conspiracy under either Iowa or Kansas law.  Those claims were all dismissed with prejudice on December 22, 2023.  Instead, Plaintiff asserts that "Schmit intentionally, knowingly, and flagrantly conspired with MMR to breach his Agreement with Raridon."[86]  But an agreement to breach the contract is not an actionable *tort*.   Without an independent, underlying tort, Plaintiff cannot establish its civil conspiracy claim as a matter of law, and the Court must therefore deny the motion for summary judgment on this claim.

Because the Court has denied Plaintiff's motion for summary judgment on the civil conspiracy claim, its request for punitive damages must be denied.[87]

## II.    Defendant's Motion to Dismiss

Defendant filed a one-sentence motion to dismiss under Fed. R. Civ. P. 12(b)(6), requesting that the Court dismiss this action "because the U.S. Federal Trade Commission issued a final rule on April 23, 2024 . . . that bans non-compete agreements and clauses nationwide."[88]  Plaintiff responds that Defendant's motion is frivolous because: (1) the Final Rule is not yet effective; and (2) the Final Rule specifically exempts existing litigation and causes of action from its purview.

The Court agrees with Plaintiff that the Final Rule has no effect on its claims or this action.  Though the Court construes Defendant's pro se pleadings liberally,[89] Defendant's motion to dismiss must be denied on the merits.  It must also be denied in part as moot to the extent it

---

[86] Doc. 136 at 36.

[87] Doc. 142 ¶ 5.a (seeking punitive damages on Count IV only).

[88] Doc. 143 at 1.

[89] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

seeks dismissal of the breach-of-contract claim, given the Court's ruling granting summary judgment in Plaintiff's favor.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Summary Judgment (Doc. 135) is **granted in part and denied in part**.  Plaintiff's motion for summary judgment is granted on Count I and denied on Count IV.  Within 21 days of entry of this Order, Plaintiff shall submit an application for reasonable attorney fees.

**IT IS FURTHER ORDERED** that  Defendant's Motion to Dismiss (Doc. 143) is **denied**.

**IT IS SO ORDERED.**

Dated: August 28, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE